J-A25028-14

2015 PA Super 45

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RAFIE L. ALI | |
| Appellant | No. 3553 EDA 2013 |

Appeal from the Judgment of Sentence of November 26, 2013
In the Court of Common Pleas of Montgomery County
Criminal Division at No.: CP-46-CR-0005222-2012

BEFORE:  DONOHUE, J., WECHT, J., and PLATT, J.[*]

OPINION BY WECHT, J.:                                    **FILED MARCH 05, 2015**

Rafie L. Ali appeals his November 26, 2013 judgment of sentence.  We conclude that Ali is not entitled to relief on his trial-related claims.  However, for the reasons set forth herein, Ali is entitled to a new sentencing proceeding.  Consequently, we vacate the judgment of sentence and we remand this case for re-sentencing.

The trial court set forth the factual and procedural history of this case in its March 25, 2014 Pa.R.A.P. 1925(a) opinion as follows:

A Criminal Complaint was filed on June 30, 2012, and [Ali] was ultimately charged with two counts of Corrupt Organizations [18 Pa.C.S. § 911]; numerous offenses under the Controlled Substance, Drug, Device, and Cosmetic Act [35 P.S. § 780-113, *et seq.*]; and two counts of criminal conspiracy [18 Pa.C.S. § 903].  The events that led to these charges began on May 22,

_____

[*]     Retired Senior Judge assigned to the Superior Court.

2012, around 11:19 a.m., when police officer Michael Breslin, dressed in a t-shirt, jeans, and sneakers, went to a store at 315 East High Street in Pottstown, Montgomery County (hereinafter "Achi Store"). Officer Breslin was given twenty dollars of U.S. Currency and his purpose was to buy the drug K2 or synthetic marijuana from the Achi Store.

After getting an iced tea from the cooler, Officer Breslin stood in line at the cash register and observed cigars and blunts on the wall behind the register, but did not see any K2. Also while standing in line, Officer Breslin noticed two state lottery workers installing or working on a lottery machine and [Ali] was behind the cash register. When it was his turn to pay, Officer Breslin asked [Ali] for a Purple Night Owl blunt and asked if [Ali] had any "Kush," which Officer Breslin knew as a brand of K2. [Ali] quietly said "no I don't" while appearing to nervously look over at the state lottery worker. Upon asking if he had any type of K2, [Ali] again said "No, no I don't." Officer Breslin purchased the iced tea and Night Owl blunt and left.

Also on May 22, 2012 around noon, Officer Peter Yambrick entered the Achi Store wearing facial hair, a t-shirt, khaki shorts and flip-flops, with the task of purchasing K2 or synthetic marijuana. Officer Yambrick retrieved a Diet Pepsi and took it to the counter where the cash register is located. [Ali] was behind the cash register and nobody else was in the store at that time. Officer Yambrick asked [Ali] for a Great Phillies blunt, which is a cigar. After [Ali] put the cigar on the counter, Officer Yambrick asked him if he had any K2, to which [Ali] shifted his eyes to look around the store and then responded, "Yeah. Five bucks. How many do you want?" Officer Yambrick told him two. [Ali] again looked around the store and reached underneath the display case, put two containers of K2 on the counter, and slid them toward Officer Yambrick. The officer paid for his items with the pre-recorded U.S. Currency he was given and put the K2 in his pocket.

After returning to the police station, another plan was developed to send Officer Yambrick back to the Achi Store to see if there were any surveillance cameras that would show the buying and selling of K2. The officer went back to the store at 1:15 p.m., retrieved a bag of Doritos and got into the checkout line behind another individual. The person in front of Officer Yambrick asked for a cigar, and then a conversation developed between the individual and [Ali], who was behind the counter. Officer

Yambrick saw [Ali] look around the store and reach under the display case to retrieve K2 for the individual in front of him.

Thereafter, around 4:30 p.m. the same day, Sergeant Michael Markovich was working at the Pottstown Police Department and served a search warrant at the Achi Store as a result of his investigations. When he arrived at the store[, Ali] was not present, but his co-defendant Mohammed Himed was working. Retrieved through the search warrant were: $636 laying on top of the open cash register drawer and alongside the register; $247 in a Dutch Masters cigar box that was located underneath the counter; $540 in a Game cigar box found on a shelf underneath the counter; twelve vials of synthetic marijuana hanging right above the box of cash, eleven of which were labeled "Dead Man" and another with the label "Hawaiian Bliss"; clear sandwich bags behind the counter on a shelf; a black plastic bag containing a clear plastic bag filled with green vegetable matter; a marijuana grinder; a .40 caliber semi-automatic handgun found on a small shelf below the counter[2]; a white box containing [twenty-four] vials of "Hawaiian Bliss," or Kush found inside the storage room behind the store; ten glass pipes commonly used to smoke crack cocaine, being sold as pens found in a cup; thirteen glass pipes commonly used to smoke marijuana on a display wall behind the counter; razor blades found underneath the counter; twenty more crack pipe pens found in a black plastic bag underneath the counter; a display rack behind the counter containing cigars, blunts, wraps and rolling papers; copper mesh wires in a box labeled Chore Boy copper scrubbing pads; copper wire found underneath the counter; and a Verizon bill addressed to [Ali].

[2] Both parties stipulated that the .40 caliber Kahr Arms ZA5383 handgun with six rounds in the magazine was lawfully purchased from Federal Coin Exchange in Pottstown by Rafie Ali approximately one week before the search warrant was executed on May 22, 2012.

[Ali] was ultimately charged with numerous crimes as a result of Sergeant Markovich's investigation. Thereafter, a jury trial commenced on June 10, 2013 and ended on June 13, 2013. The jury found [Ali] guilty of the following charges: Count 1; Corrupt Organizations—Association [18 Pa.C.S. § 911(b)(3)]; Count 2; Corrupt Organizations [18 Pa.C.S. § 911(b)(4)]; Counts 3, 4, 5, 6, and 7, Possession With Intent to Deliver Synthetic Cannabinoids [35 P.S. § 780-113(a)(30)]; Counts 13, 14, 15,

16, and 17, Delivery of Paraphernalia [35 P.S. § 780-113(a)(33)]; and Counts 28 and 29, Criminal Conspiracy [18 Pa.C.S. § 903].

\* \* \*

[At the November 26, 2013 sentencing hearing, the trial court permitted the Commonwealth to introduce victim impact testimony from the families of James Crawford and Rachel Witt, victims of a vehicle crash that allegedly was caused by the use of synthetic marijuana.] [T]he crimes [Ali] was charged and ultimately convicted of arose from an investigation that occurred as a result of a fatal accident. Detective Robert Turner III was called to the scene of this accident around 11:29 p.m. on May 21, 2012. [Fifteen]-year-old Rachel Witt and [twenty-eight]-year-old James Crawford were both killed [in] the vehicle crash. As part of a search warrant, Detective Turner located a bottle of a brownish-green leafy substance in the back of the vehicle, which was labeled "Dead Man." This substance was confirmed by the National Medical Services lab as containing AM-2201 and JWH-018, also known as synthetic marijuana.

Roger Malloy was determined to be the driver of the vehicle on the night of the accident and ultimately pled guilty to two counts of Homicide By Vehicle while Driving Under the Influence, and Accidents Involving Personal Injury or Death While Not Properly Licensed. The presence of AM-2201 and delta-9-THC was found in Mr. Malloy's blood from a toxicology report taken the morning after the accident.

During [Ali's] sentencing hearing, the Commonwealth presented testimony from Roger Malloy's guilty plea, where he admitted to smoking K2 before the accident and to the negative [effects that] it had on him. Additionally, during [Ali's] trial Dr. Edward Barbieri described the toxic impact synthetic marijuana can have on individuals, even when used in low doses. Finally, during [] trial the jury found [Ali] guilty beyond a reasonable doubt [as an accomplice] of delivering synthetic marijuana to James Crawford and Kendall Harper on May 21, 2012, both of whom were in the vehicle involved in the accident that took place the same day.

[The trial] court granted the Commonwealth's motion and permitted the Commonwealth to incorporate the victim impact testimony of Benjamin Witt; Lillian Mumford; and Tracy Ann Witt, which they previously gave under oath at the sentencing for Roger Malloy.

\*    \*    \*

> On November 26, 2013, the court sentenced [Ali] to fifteen [to] thirty months in a State Correctional Institution on Count 1, Corrupt Organizations; another fifteen [to] thirty months . . . for Count 2, Corrupt Organizations; Count 3, Possession with Intent to Deliver a Controlled Substance, with a school zone enhancement, not less than twelve nor more than [twenty-four] months; Count 4, Possession with Intent to Deliver a Controlled Substance, again with a school zone enhancement, not less than twelve nor more than [twenty-four] months; Count 5, another Possession with Intent to Deliver a Controlled Substance with a youth enhancement, not less than twelve nor more than [twenty-four] months; and for Count 6, Possession with Intent to Deliver a Controlled Substance with a youth enhancement, not less than [eighteen months] nor more than [thirty-six] months. All sentences [were ordered] to run consecutively and the remaining counts are a sentence of guilt without further penalty.
>
> [Ali] did not file any post-sentence motions. On December 18, 2013, he filed a counseled Notice of Appeal [to] our Superior Court. [Ali] subsequently complied with [the trial] court's directive that he produce and serve a Concise Statement of Matters Complained of on Appeal within [twenty-one] days and in accordance with Pennsylvania Rule of Appellate Procedure 1925(b).

Trial Court Opinion ("T.C.O."), 3/25/2014, at 1-5, 10-11 (some footnotes and citations to the notes of testimony omitted). On March 25, 2014, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a).

Ali raises the following issues for our consideration:

1. Whether the Honorable Trial Court erred by applying the school zone enhancement for sentencing purposes because the Commonwealth did not establish that the Y.W.C.A. fell within the ambit of the enhancement?

2. Whether the Honorable Trial Court erred by determining that the youth enhancement applied for sentencing purposes because the Commonwealth never proved that [Ali] delivered drugs to a minor?

3. Whether the Honorable Trial Court erred by granting the Commonwealth's motion to introduce victim impact testimony from an unrelated criminal matter when said testimony was irrelevant and prejudicial, and should not have been considered by the court for sentencing purposes?

4. Whether the Honorable Trial Court violated [Ali's] constitutional rights by applying sentencing enhancements in violation of **Alleyne**[1] and whether the sentence imposed was an abuse of discretion?

5. Whether the Honorable Trial Court erred by preventing [Ali] from publishing exhibit D-6, the laboratory report upon which [Ali] relied for his understanding and belief the substance he sold was legal, since D-6 was admitted into evidence?

6. Whether the Honorable Trial Court erred by precluding [Ali] from introducing evidence that the handgun found at the Achi store was under the control and dominion of the co-defendant?

Brief for Ali at 4.

Because we ultimately grant Ali a new sentencing hearing, we begin with his trial-related claims, upon which we conclude that Ali is not entitled to relief. We start with Ali's fifth stated claim: whether the trial court erred by prohibiting him from publishing a laboratory report to the jury, which Ali alleged caused him to believe that selling K2 was legal.

Ali testified in his own defense at trial. During his direct examination, Ali testified that his co-defendant and business partner, Mohammed Himed,

---

[1] **Alleyne v. United States**, 133 S.Ct. 2151 (U.S. 2013).

disagreed as to whether to sell K2 in the Achi Store.[2] Ali believed that the substance was illegal, while Himed maintained that K2, being a synthetic substance, was legal. To solidify his position and to convince Ali that K2 was legal to sell, Himed produced a laboratory report from Triangle Park Laboratories, Inc., which indicated on the face of the report that Triangle Park was a DEA Registered Analytical Laboratory. The report apparently indicated to Ali that K2 did not contain any substances that were categorized as controlled substances in Pennsylvania. Relying upon this report, Ali became convinced that K2 was not illegal, and that selling K2 would not be a crime. Ali testified that he truly believed that selling K2 was not illegal and yielded to Himed's desire to sell the substance in the Achi Store.

Neither the authenticity nor the veracity of the laboratory report was established by an expert or other qualified witness. Nonetheless, Ali's counsel attempted to publish the report to the jury on multiple occasions over the Commonwealth's objections. The trial court sustained the Commonwealth's objections. Ali's counsel admitted that the contents of the laboratory report were false, and that he could not offer the document for the truth contained therein. Nonetheless, he argued that, because the document was used to show the effect that it had on Ali, the jury was

---

[2] Khalil Jones, an employee at the Achi Store, corroborated Ali's testimony that Ali and Himed disagreed over whether to sell K2 in the Achi Store.

entitled to see the document itself. The trial court permitted Ali's counsel to argue to the jury the effect that the document had on Ali, but refused to publish the document to the jury because the court considered it to be double hearsay if offered for the truth of the contents contained within the report, and, perhaps more importantly, factually incorrect.

On redirect examination, Ali's counsel asked Ali additional questions regarding the laboratory report in an attempt to demonstrate that the report appeared to be authentic and reliable such that Ali's reliance upon it was reasonable. Following another Commonwealth objection, the trial court instructed the jury as follows:

> Ladies and gentlemen of the jury, this document which is going to be offered into evidence is not being offered for the truth of the matter asserted, meaning you're never going to see this document, you're never going to be able to look at it, you're never going to be able to compare it because it's never been offered into evidence for the truth of the matter asserted. It is an exception. It is being offered simply as to whether he saw a document and the effect that it had upon him. This is important.

Notes of Testimony ("N.T."), 6/12/2013, at 150.

Presently, Ali argues that the jury should have been able to view the document and resolve any credibility disputes, a task relegated solely to the jury. Ali further maintains that it was necessary for the jury to view the document in order to properly assess his credibility. Ali asserted that he sincerely believed that selling K2 was not illegal, which was exclusively based upon his reliance on the authenticity and reliability of the report. The only way that the jury could have determined whether Ali's belief was

sincere was to view the document and to determine whether it appeared worthy of belief on its face. Additionally, Ali contends that the Commonwealth opened the door to publication by cross-examining Ali vigorously about his reliance upon the report. *See* Brief for Ali at 36.

We review all matters touching upon the admission of evidence, including the trial court's gatekeeping function regarding what evidence a jury gets to observe and handle during a trial, for an abuse of discretion. ***See Commonwealth v. Brown***, 52 A.3d 1139, 1197 (Pa. 2012) (citation omitted); ***Commonwealth v. Dupre***, 866 A.2d 1089, 1102 (Pa. Super. 2005). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." ***Commonwealth v. Mendez***, 74 A.3d 256, 260 (Pa. Super. 2013) (citation omitted), *appeal denied*, 87 A.3d 319 (Pa. 2013). "[I]f in reaching a conclusion the trial court over-rides [*sic*] or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error." ***Commonwealth v. Weakley***, 972 A.2d 1182, 1188 (Pa. Super. 2009) (citation omitted).

Our case law is sparse concerning the standards that we must apply to a trial court's decision to prohibit a defendant from displaying to the jury a particular exhibit. Nonetheless, our Supreme Court has articulated the following standard with regard to the items that a jury may take with it into the deliberation room:

> The underlying reason for excluding certain items from the jury's deliberations is to prevent placing undue emphasis or credibility on the material, and de-emphasizing or discrediting other items not in the room with the jury. If there is a likelihood the importance of the evidence will be skewed, prejudice may be found; if not, there is no prejudice *per se* and the error is harmless.

***Commonwealth v. Strong***, 836 A.2d 884, 888 (Pa. 2003). Although not directly applicable, we nonetheless find the standard helpful, and we discern no meaningful basis to distinguish between publication to a jury of an exhibit and providing the jury with that exhibit during deliberations. Thus, we apply this standard to Ali's claim.

Here, the trial court did not abuse its discretion by prohibiting Ali from publishing the controversial laboratory report to the jury. Ali testified that he relied upon the report to formulate his honest belief that selling K2 was not illegal. Ali's counsel averred that the document was not being offered as evidence for the truth of the matter contained therein, but instead to demonstrate the effect that the report had on Ali. However, Ali's counsel acknowledged at trial that the contents of the report itself were false. N.T., 7/12/2013, at 84-90. In explaining why he could not verify the authenticity (or veracity, for that matter) of the report, counsel also revealed to the trial court that the author of the report had been indicted in New York for his role in creating the fraudulent report. ***Id.*** at 87. The danger that the jury might skew or place undue emphasis upon the contents of the report is evident. Even with a cautionary instruction, the potential for the jury to misconstrue the document, or be misled by its falsity, simply was too high, and this

overcame whatever probative value may have attached to the document. Thus, the trial court did not abuse its discretion in denying counsel's request to publish the report to the jury.

We also note that, even if we were to conclude that the trial court's decision was erroneous, such an error would have been harmless. Pursuant to the harmless error doctrine, "an error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict." **Strong**, 836 A.2d at 887 (citing **Commonwealth v. Story**, 383 A.2d 155, 162 (Pa. 1978)).

First, during direct, cross, and redirect examination, Ali was questioned extensively about the report. Through this questioning, the jury was apprised of the look of the report, the various markings on the report, and the lack of authenticating indicia such as a signature by the author. Thus, the jurors were well-informed about the document, rendering the purported error in precluding them from handling or observing the report first-hand relatively inconsequential.

Second, the evidence that Ali knew that selling K2 was not legal was overwhelming, such that any alleged error by the trial court was harmless. As noted earlier, Ali contends that the jury needed to observe the document to assess Ali's credibility with regard to his claim that he believed that selling

K2 was not illegal. However, Ali's own actions while working at the Achi Store belied his defense.

When Officer Breslin first asked Ali for K2, there were other people in the store. Ali responded nervously, looked at the other people in the store, and told Officer Breslin that he did not have K2 for sale. Officer Breslin asked a second time, and, again, Ali responded quietly and nervously that he did not have any. However, when Officer Yambrick entered the store a short time later, no one else was inside of the store. He also asked Ali for K2. This time, Ali looked around the store and, upon seeing that they were alone, asked Officer Yambrick how much K2 he wanted. Ali again looked around the store to make sure that they were alone, reached underneath the counter, and produced two containers of K2. Officer Yambrick went back to the store later that day and observed Ali selling K2 to a person in front of him in line in the same surreptitious manner as Ali had done earlier in the day.

This evidence demonstrated that Ali knew that selling K2 was not within the bounds of the law. Ali did not have K2 prominently displayed on the counter of the Achi Store as if it were just another product. Rather, he had it hidden underneath the counter, and had a separate container there to collect the money from those particular sales. When other people were in the store, Ali declined to sell K2. He acted suspiciously and nervously until he was alone with a customer. It was only then that he sold the K2. By themselves, these actions demonstrate that Ali knew that selling K2 was not

legal. This would render any alleged error by the trial court with regard to the laboratory report harmless beyond a reasonable doubt.

Ali next contends that the trial court erred by excluding certain statements that were made by co-defendant Himed regarding the possession and control of the .40 caliber gun that was found when the police executed the search warrant on the Achi Store. Ali legally purchased the handgun approximately one week before the search warrant was executed. However, no testimony was presented at trial to establish that Ali ever was seen in actual possession of the gun. Ali attempted to demonstrate that Himed, who acted as the head of the business, had exclusive control of the weapon. To do so, Ali tried to ask Khalil Jones, an employee of the store, about a question that Jones overheard Himed asking another individual. Ali alleged at trial that Jones heard Himed asking the unknown person "can you get me bullets for the gun?" N.T., 7/12/2013, at 12.

The trial court prohibited Ali's counsel from asking this question upon the basis that it was inadmissible hearsay. Presently, Ali argues that the statement was not being offered for the truth of the matter asserted, but rather to show "the fact that Himed made the statement and Himed's state of mind regarding his ownership and control of the gun." Brief for Ali at 38. We agree with Ali. The statement was not hearsay. However, the trial court's evidentiary error was harmless.

As noted earlier, we review a trial court's evidentiary decisions for an abuse of discretion. *See* ***Brown***, *supra*. Hearsay is an out-of-court

statement offered to prove the truth of the matter asserted. **Commonwealth v. Puskar**, 740 A.2d 219, 225 (Pa. 1999). As a general rule, hearsay is inadmissible, because such evidence lacks guarantees of trustworthiness fundamental to our jurisprudence. **Commonwealth v. Dargan**, 897 A.2d 496, 500 (Pa. Super. 2006) (citations omitted). The rule against admitting hearsay evidence stems from its presumed lack of reliability; the declarant cannot be challenged regarding the accuracy of the statement. **See Commonwealth v. Rush**, 605 A.2d 792, 795 (Pa. 1992). Importantly, "[w]hen an extrajudicial statement is offered for a purpose apart from proving the truth of its contents, it is not hearsay and is not excluded under the hearsay rule." **Commonwealth v. Cassidy**, 462 A.2d 270, 272 (Pa. Super. 1983) (citations omitted).

Here, the statement that Ali's counsel sought to introduce through Khalil Jones' testimony was not hearsay, as it was not being offered for the truth of the matter asserted. Jones purportedly would have testified that he overheard Himed ask someone, "[C]an you get me bullets for the gun?" If this statement were offered for its truth, then Ali would have been seeking to prove that Himed actually wanted to know whether the listener could obtain bullets. However, whether that person could do so plainly was not what Ali sought to establish. Rather, he proffered the statement to show that Himed controlled the gun, "a purpose apart" from asserting the truth of the statement. **See Cassidy**, *supra*.

Nonetheless, beyond a reasonable doubt, the error was harmless. The evidence overwhelmingly established that, in concert with Himed, Ali sold K2 from the Achi Store. As we discussed above, Ali evidenced awareness that selling K2 was illegal. The police officers purchased the substance directly from Ali. The spoils of the search warrant revealed abundant evidence to support each of the charges of which Ali was convicted. Ali's introduction of this one statement would not have overcome the overwhelming evidence of guilt. Consequently, Ali is not entitled to relief on his trial claims.

We turn to Ali's sentencing challenges. We begin with Ali's third stated claim: that the trial court erred in permitting certain victim impact testimony at sentencing. Ali is entitled to relief on that claim. He must be afforded a new sentencing hearing. Having concluded as much, we must then review Ali's remaining claims to determine which (if any) sentencing enhancements the trial court may impose at resentencing.

At Ali's trial, the jury learned of the tragic deaths of Rachel Witt, age fifteen, and James Crawford, age twenty-eight. On May 21, 2012, Kendall Harper, Robert Malloy, Roger Malloy, and James Crawford stopped at the Achi Store to purchase K2 synthetic marijuana, something that Harper had done on two prior occasions. Harper and Crawford entered the store and returned to the car shortly thereafter in possession of K2. Undisputedly, it was Muhammed Himed, and **not** Ali, who sold K2 to Harper and Crawford on that occasion. *See* Brief for the Commonwealth at 6. Except for Harper, all of the individuals smoked the K2.

- 15 -

Later that evening, Roger Malloy was driving a vehicle with all of the above-referenced individuals as passengers, including Rachel Witt, whom they picked up after stopping at the Achi Store. Malloy wrecked the vehicle, resulting in the deaths of Witt and Crawford. Evidence of synthetic marijuana was found in Roger Malloy's blood.

The jury was presented with evidence of the wreck by way of the following stipulation:

> [] Kendall Harper, date of birth 12-9-95, gave statements to police and if called to testify would say on the evening of May 21st, 2012, he was with Roger Malloy, Robert Malloy and James Crawford. Roger drove everyone to the Achi Store in a Lincoln Continental and Kendall and James went inside the store.
>
> When they returned to the Lincoln Continental, they drove to another location and picked up Rachel Witt. Roger then drove everybody to Bright Hope Villiage. While there, James Crawford produced K2 and everybody smoked it except Kendall. The K2 was rolled up in a Dutch to smoke it. Kendall says the color of the K2's label was red and yellow and it was marked as Dead Man.
>
> Kendall has purchased K2 from the Achi store on two prior occasions. Kendall described the person who sold him the K2 on these occasions as being a Muslim male with long hair. Kendall explained the manner in which he bought the K2 as he would have to wait until the store was empty. The Muslim male took the K2 from underneath the counter and it was not on display.
>
> [] The person that sold the synthetic marijuana labeled Dead Man which was sold on the evening of May 21, 2012, from the store to James Crawford and Kendall Harper was not identified as Rafie Ali.

N.T., 6/11/2013, at 132-33.

- 16 -

Roger Malloy pleaded guilty to two counts of homicide by vehicle while driving under the influence and related crimes based upon his role in Witt's and Crawford's deaths. *See* T.C.O. at 10. Despite the fact that Ali did not sell the synthetic marijuana to Harper and Crawford on the night of the crash, at Ali's sentencing, the trial court permitted the Commonwealth to introduce evidence from Roger Malloy's guilty plea hearing, including Malloy's admission to smoking K2 before driving the vehicle and the victim impact testimony given by members of the decedents' families at Malloy's guilty plea hearing. The trial court acknowledged that the jury could not have attributed the deaths to Ali, but nonetheless offered the following rationale for admitting and considering the victim impact testimony:

> [D]uring the month of May, the sale to community members, the sale to undercover officers, and sadly, the sale to Mr. Crawford, Mr. Harper, that ultimately was connected to the death of Miss Witt and [Mr. Crawford] . . . . Which directly led to his death is being considered by the Court [*sic*].
>
> Now, again, I make specific findings **that there is nothing that a jury—and this court had severed that case that they caused the death. And there was nothing to find that**.
>
> But the Commonwealth has presented evidence in this particular case that the substances found in Mr. Malloy's system and clearly the timing of exactly what happened on that tragic day, that sad and tragic day that Mr. Crawford and Miss Witt lost their lives at the hands of Mr. Malloy are connected.
>
> And they're connected to what you do, Mr. Ali, exactly what you do. If you peddle death and dangerous substances, you can expect something like this to happen. This is within the purview of being a business owner. If you take the risk, you should expect it. This is a stop and shop. This is not a sit-down store where people come in and dine. It is meant to buy something and go.

- 17 -

And when people buy something and go in the nature of convenience stores in this society, they do so by vehicle. They drive up and they drive away. And if you sell them something that can lead to their death, that can lead to them being impaired, then this is a consequence that should be readily known to you.

The sad part of it is you didn't. I believe you simply were operating for profit, you took a risk, and your risk ended up contributing, leading, being connected to, whatever you want to say—**the Court is not finding that you caused their death directly, but you certainly were connected to a series of horrific events that led to unspeakable tragedy for the families that this Court had to listen to during the sentencing phase of Mr. Malloy's case. So I cannot turn a blind eye to it.** It is simply a fact. And that was the tragic turn of events that now leads to your conviction and your sentencing.

N.T., 11/26/2013, at 77-78 (emphases added). By the trial court's own admissions, although Ali was not directly responsible for the two deaths, the court considered the victim impact statements related to those deaths when sentencing Ali because the court believed that they were "connected." For the reasons that follow, we conclude that considering such evidence was erroneous, and constituted an abuse of discretion.

We review challenges to the admission of victim impact statements for an abuse of discretion. *Commonwealth v. Flor*, 998 A.2d 606, 634 (Pa. 2010). Pursuant to 42 Pa.C.S. § 9738:

[I]n the trial of a defendant accused of an offense, . . . a court shall not order the exclusion of any **victim of the offense** from the trial on the basis that the victim may, during the sentencing phase of the proceedings:

(1) make a victim impact statement or present any victim impact information in relation to the sentence to be imposed on the defendant; or

- 18 -

> (2)   testify as to the effect of the offense on the victim or the family of the victim.

*Id.* (emphasis added).  The statute refers to the Crime Victim's Act for the definition of a victim, which defines the term as any one of the following persons:

> (1)   A direct victim.
>
> (2)   A parent or legal guardian of a child who is a direct victim, except when the parent or legal guardian of the child is the alleged offender.
>
> (3)   A minor child who is a material witness to any of the following crimes and offenses under 18 Pa.C.S. (relating to crimes and offenses) committed or attempted against a member of the child's family:
>
>       Chapter 25 (relating to criminal homicide)
>
>       Section 2702 (relating to aggravated assault)
>
>       Section 3121 (relating to rape)
>
> (4)   A family member of a homicide victim, including stepbrothers or stepsisters, stepchildren, stepparents or a fiancé, one of whom is to be identified to receive communication as provided for in this act, except where the family member is the alleged offender.

18 P.S. § 11.103.

"The United States Supreme Court has held that the Eighth Amendment to the United States Constitution does not present a bar to the admission of victim impact evidence."  *Flor*, 998 A.2d at 633 (citing *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)).   Victim impact evidence is "designed to show [] each victim's uniqueness as a human being."  *Payne*, 501 U.S. at 823 (citation omitted).   "Victim impact evidence is simply

another form or method of informing the sentencing authority about the specific harm caused by the crime in question." *Id.* at 825.

However, as section 9738 makes clear, before victim impact statements may be admitted at a sentencing hearing, there first must be an identifiable victim of the crime for which the defendant was convicted. *See* 42 Pa.C.S. § 9738 ("[A] court shall not order the exclusion of any **victim of the offense**. . . ."). Indeed, "[w]here a defendant is convicted of a crime against a person, that person is considered by the law to have been a victim of the defendant's crimes." *Commonwealth v. Smithton*, 631 A.2d 1053, 1057 (Pa. Super. 1993). Instantly, Ali was not convicted of a crime against a person. Moreover, for the crimes of which Ali was convicted, there is no identifiable victim to render a victim impact statement admissible. The parties and the trial court have conceded that Ali did not sell K2 to any of the parties involved in the wreck that resulted in the two deaths. As the Commonwealth acknowledged, Himed, not Ali, sold the K2 to Harper and Crawford, K2 which Roger Malloy ingested before wrecking the car. *See* Brief for the Commonwealth at 6.

Both the Commonwealth and the trial court rely upon the premise that there existed a "connection" between Ali's crimes and the ultimate deaths of Witt and Crawford. *See* Brief for the Commonwealth at 23; N.T., 11/26/2013, at 77-78. Although such a connection may in fact exist, a mere link between two distinct events is insufficient to trigger the applicability of section 9738. The unambiguous language of the statute requires a victim to

be identified as such before his or her victim impact statement is admissible. Additionally, the Crime Victim's Act requires proof of a "direct victim" and similarly situated individuals; it does not define a "victim" based upon the Commonwealth's ability to string together attenuated connectors tying an individual to indirectly-related events, tragic as those events may be.

Witt and Crawford's deaths were tragic. However, those individuals are not Ali's victims under any reasonable reading of section 9738, particularly where all parties admit that Ali did not commit the specific act that led to the fatal wreck. We find no meaningful difference between this case and *Smithton*. In *Smithton*, the appellant had been charged in three separate criminal informations. In one of the cases, the appellant, who was suffering from HIV, allegedly unlawfully entered a family's home without their consent. *Smithton*, 631 A.2d at 1055. The owner of the home fought off the appellant with a shard of glass from a broken window through which the appellant entered the home. *Id.* at 1054. At trial, the appellant conceded entering into the home, but argued that his entry was justified because he feared for his life. One of the other sets of charges arose from the appellant's behavior during his arrest and at the hospital after he was transported there by the police. The final set of charges resulted from the appellant's behavior at his arraignment for the prior two sets of charges. *Id.* at 1054-55.

The jury credited the appellant's defense that he was justified in entering the home, and acquitted him of all charges relating to that incident.

- 21 -

The jury convicted him of all of the other charges. Nonetheless, at sentencing, the trial court permitted the family residing in the home to testify at length about how the appellant's entry into the home affected them and their lives, including their fears that they may have contracted HIV from the appellant. *Id.* at 1055-56.

On appeal, this Court reversed the judgment of sentence and remanded for a new sentencing hearing to be held without the victim impact testimony. We first noted that, because the appellant was acquitted of the charges relating to the entry into the home, the victim impact testimony was irrelevant. *Id.* at 1057. Essentially, we held that, due to the acquittals, the homeowners were not victims of the alleged crime. We explained that "there is, strictly speaking, no legal authority for considering the [homeowners] 'victims' or for considering the impact of appellant's conduct on their lives." *Id.* at 1058. Critically, we rejected the notion that any connection justified the admission of the victim impact testimony: "The charges of which appellant was found guilty, though indirectly related by the loosely formed concatenation of events [that] transpired on the evening of appellant's arrests, were contained in separate Criminal Informations and did not involve the [homeowners.]" *Id.* We held that to admit the testimony "would give precious little meaning to the acquittal." *Id.*

In describing the need to vacate the sentence, we noted that "[i]t is an abuse of discretion, as a denial of due process, for the sentencing court to consider irrelevant factors during sentencing." *Id.* at 1056. We

acknowledged that "[i]t is not enough that a trial court simply **entertained** impermissible evidence in its deliberations." *Id.* (emphasis in original). Although a court "is ordinarily presumed to be capable of identifying and properly disregarding all but the most prejudicial and inflammatory evidence," *Commonwealth v. Penrod*, 578 A.2d 486, 491 (Pa. Super. 1990), a sentence must be vacated when "it reasonably appears from the record that the trial court **relied** in whole or in part upon such [an impermissible] factor." *Commonwealth v. Bethea*, 379 A.2d 102, 106 (Pa. 1977) (emphasis in original). Citing *Bethea*, we concluded in *Smithton* that, although "[i]t is true that the trial court relied upon factors other than the [homeowners'] testimony in imposing sentence, . . . [i]t is also irrelevant for our purposes. Where, as here, a trial court relies upon an impermissible factor, **in whole or in part**, new sentencing must be afforded." *Smithton*, 631 A.2d at 1058 (citing *Bethea*, *supra*; emphasis in original).

As in *Smithton*, there is no basis upon which we may conclude that Witt and Crawford were victims of the crimes of which Ali was convicted. The charges against Ali did not implicate the fatal car accident. We reject the trial court's attempt to connect the relevant events in order to justify admitting the victim impact testimony, just as we did in *Smithton*. The trial court's own words demonstrate that the court relied to some extent upon the victim impact testimony just as the trial court did in *Smithton*. That testimony was irrelevant, and reliance upon that evidence violated due

- 23 -

process. *See Smithton*, 631 A.2d at 1056. Consequently, the trial court abused its discretion, and we must vacate the judgment of sentence and remand for a new sentencing hearing at which the trial court may not consider the victim impact testimony. *See Bethea*, *supra*.

The remainder of Ali's issues that we will review pertain to the trial court's consideration of the school zone sentencing enhancement and the enhancement for delivery of a controlled substance to a youth ("youth enhancement") when calculating where Ali's offense fell within the sentencing guidelines. Pursuant to 204 Pa. Code § 303.10(b)(2), the school zone enhancement compels a trial court to consider heightened guideline ranges when "the court determines that the offender manufactured, delivered or possessed with intent to deliver a controlled substance within 250 feet of the real property on which is located a public or private elementary or secondary school." *Id.* Similarly, the youth enhancement requires the trial court to consider elevated guideline ranges in sentencing an individual when "the court determines that the offender distributed a controlled substance to a person or persons under the age of 18." *Id.* at § 303.10(b)(1).

We begin with Ali's contention that the application of these enhancements was unconstitutional in light of the United States Supreme Court's recent decision in *Alleyne v. United States*, 133 S.Ct. 2151 (U.S. 2013). *Alleyne* challenges implicate the legality of a sentence. *Commonwealth v. Lawrence*, 99 A.3d 116, 123 (Pa. Super. 2014). "A

- 24 -

challenge to the legality of a sentence . . . may be entertained as long as the reviewing court has jurisdiction." ***Commonwealth v. Borovichka***, 18 A.3d 1242, 1254 n.8 (Pa. Super. 2011) (citation omitted). "An illegal sentence must be vacated." ***Commonwealth v. Rivera***, 95 A.3d 913, 915 (Pa. Super. 2014) (citation omitted). "Issues relating to the legality of a sentence are questions of law. . . . Our standard of review over such questions is *de novo* and our scope of review is plenary." ***Commonwealth v. Akbar***, 91 A.3d 227, 238 (Pa. Super. 2014) (citations omitted).

In ***Commonwealth v. Miller***, 102 A.3d 988 (Pa. Super. 2014), we presented the relevant portion of the ***Alleyne*** Court's rationale as follows:

> In ***Alleyne***, the Supreme Court held that "facts that increase mandatory minimum sentences must be submitted to the jury" and must be found beyond a reasonable doubt. ***Alleyne***, *supra* at 2163. ***Alleyne*** is an extension of the Supreme Court's line of cases beginning with ***Apprendi v. New Jersey***, 530 U.S. 466 (2000). In ***Alleyne***, the Court overruled ***Harris v. United States***, 536 U.S. 545 (2002), in which the Court had reached the opposite conclusion, explaining that there is no constitutional distinction between judicial fact[-]finding which raises the minimum sentence and that which raises the maximum sentence.
>
> > It is impossible to dissociate the floor of a sentencing range from the penalty affixed to the crime. Indeed, criminal statutes have long specified both the floor and ceiling of sentence ranges, which is evidence that both define the legally prescribed penalty. This historical practice allowed those who violated the law to know, *ex ante*, the contours of the penalty that the legislature affixed to the crime—and comports with the obvious truth that the floor of a mandatory range is as relevant to wrongdoers as the ceiling. A fact that increases a sentencing floor, thus, forms an essential ingredient of the offense.

> Moreover, it is impossible to dispute that facts increasing the legally prescribed floor aggravate the punishment. Elevating the low-end of a sentencing range heightens the loss of liberty associated with the crime: the defendant's expected punishment has increased as a result of the narrowed range and the prosecution is empowered, by invoking the mandatory minimum, to require the judge to impose a higher punishment than he might wish. Why else would Congress link an increased mandatory minimum to a particular aggravating fact other than to heighten the consequences for that behavior? This reality demonstrates that the core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury.
>
> *Alleyne*, [133 S.Ct.] at 2160-61 (internal quotation marks and citations omitted).

*Miller*, 102 A.3d at 994-95 (citations modified).

*Alleyne* has no application to the sentencing enhancements at issue in this case. The parameters of *Alleyne* are limited to the imposition of mandatory minimum sentences, *i.e.*, where a legislature has prescribed a mandatory baseline sentence that a trial court must apply if certain conditions are met. The sentencing enhancements at issue impose no such floor. Rather, the enhancements only direct a sentencing court to consider a different range of **potential** minimum sentences, while preserving a trial court's discretion to fashion an individual sentence. By their very character, sentencing enhancements do not share the attributes of a mandatory minimum sentence that the Supreme Court held to be elements of the offense that must be submitted to a jury. The enhancements do not bind a trial court to any particular sentencing floor, nor do they compel a trial court

in any given case to impose a sentence higher than the court believes is warranted. They require only that a court consider a higher range of possible minimum sentences. Even then, the trial court need not sentence within that range; the court only must consider it. Thus, even though the triggering facts must be found by the judge and not the jury—which is one of the elements of an *Apprendi* or *Alleyne* analysis—the enhancements that the trial court applied in this case are not unconstitutional under *Alleyne*.

Ali maintains that, because both of the enhancements contain the word "shall," the enhancements are mandatory in nature, and must fall within *Alleyne*'s holding. However, the enhancements only require the trial court to consider a certain range of sentences. The enhancements do not bind the trial court to impose any particular sentence, nor do they compel the court to sentence within the specified range. Indeed, it is well-settled that the sentencing guidelines ultimately are only advisory. *Commonwealth v. Griffin*, 804 A.2d 1, 8 (Pa. Super. 2002). Thus, *Alleyne* has no application to the enhancements.

Ali next argues that the trial court should not have applied the school zone enhancement, because the Commonwealth failed to prove that the Y.W.C.A. constituted a "public or private elementary or secondary school," within the meaning of subsection 303.10(b)(2). We agree with Ali.

The utilization of a sentencing enhancement concerns the trial court's application of the sentencing guidelines, and, therefore, implicates the

discretionary aspects of Ali's sentence. ***Commonwealth v. Bowen***, 612 A.2d 512, 514 n.3 (Pa. Super. 1992). In ***Commonwealth v. Greene***, 702 A.2d 547 (Pa. Super. 1997), we explained an appellant's burden when raising such a challenge, as follows:

> Unlike a challenge to the legality of a sentence, there is no absolute right to direct appellate review of a discretionary sentencing claim. Rather, a party who desires to raise such matters must petition this court for permission to appeal and demonstrate that there is a substantial question that the sentence is inappropriate.
>
> In fulfilling this requirement, the party seeking to appeal must include in his or her brief a concise statement of the reasons relied upon in support of the petition for allowance of appeal [pursuant to Pa.R.A.P. 2119(f). In that statement, the appellant must demonstrate that there exists a substantial question that the sentence is inappropriate under the Sentencing Code.]
>
> \*     \*     \*
>
> The determination of whether a substantial question exists must be made on a case-by-case basis. It is only where an aggrieved party can articulate clear reasons why the sentence issued by the trial court compromises the sentencing scheme as a whole that we will find a substantial question and review the decision of the trial court. This [C]ourt has been inclined to find that a substantial question exists where the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms underlying the sentencing process.

***Id.*** at 551 (citations omitted).

Ali has complied technically with Pa.R.A.P. 2119(f) by including a concise statement in his brief. ***See*** Brief for Ali at 17. In his Rule 2119(f) statement, Ali maintains that the trial court's consideration of the sentencing

enhancements in this case presents a substantial question. We agree. We have held consistently that challenges to the sentencing enhancements in the sentencing guidelines present substantial questions justifying our review of an appellant's discretionary aspects of a sentencing claim. *See Commonwealth v. Rhoades*, 8 A.3d 912, 916 (Pa. Super. 2010); *Commonwealth v. Kneller*, 999 A.2d 608, 614 (Pa. Super. 2010); *Commonwealth v. Hatcher*, 746 A.2d 1142, 1144 (Pa. Super. 2000); *Greene*, 702 A.2d at 551; *Bowen*, 612 A.2d at 514. Thus, we grant Ali's petition for allowance of appeal, and we will review his challenges to the application of both the school zone and the youth sentencing enhancements.

The trial court held two sentencing proceedings in this case, staying the first proceeding to permit the parties to consider and address the impact of *Alleyne*, which was newly-decided at the time, upon Ali's sentence. At the first sentencing hearing on October 8, 2013, Ali stipulated to a Commonwealth report that contained a summary of information, to which a police officer would have testified had he been called, pertaining to the Y.W.C.A. at issue for the school zone sentencing enhancement. The report indicated that the Y.W.C.A. was located within 250 feet of the Achi Store, that the Y.W.C.A. operated a state-licensed early learning center with a full daycare program that is entitled "Ready, Set, Grow," and that the Y.W.C.A. was in operation at the time of Ali's crimes. Ali also stipulated to the admissibility and the authenticity of a photograph of the Y.W.C.A., which

indicated on the door of the facility that the Y.W.C.A. considered itself a pre-school.  N.T., 10/8/2013, at 9-11; N.T., 11/26/2013, at 11.

There is very little case law addressing the school zone enhancement, and none interprets the terms "public or private elementary or secondary school."  Consequently, we first consider two cases that have addressed whether a daycare or a pre-school falls within the ambit of the drug-free school zone mandatory minimum sentence that is codified at 18 Pa.C.S. § 3617.[3]  Section 3617 purports to impose a mandatory minimum sentence on individuals over the age of eighteen who deliver, or possess with intent to deliver, a controlled substance "within 1,000 feet of the real property on which is located a public, private or parochial school or a college or university or within 250 feet of the real property on which is located a recreation center or playground or on a school bus."  18 Pa.C.S. § 3617. However, even though both the mandatory minimum provision and the sentencing enhancement seek to increase penalties for drug trafficking near school zones, the operative language in the two sections differs in such a way that the two cases interpreting the provisions do not apply to the sentencing enhancements at issue herein.

---

[3]     Section 3617 was held unconstitutional by this Court in **Commonwealth v. Watley**, 81 A.3d 108 (Pa. Super. 2013).  Nonetheless, the unconstitutionality of this mandatory minimum sentence has no bearing upon our analysis.

Because no case law yet has addressed whether the sentencing enhancement applies to drug offenses near daycares or pre-schools, the parties predictably have relied upon the two cases addressing the drug-free school zone mandatory minimum sentence. The Commonwealth argues that the Y.W.C.A. operated a pre-school, and that **Commonwealth v. Lewis**, 885 A.2d 51 (Pa. Super. 2005), should control. In **Lewis**, we interpreted the above-quoted language from section 6317, and held that a pre-school fell squarely within that language. **Id.** at 58. Quoting **Commonwealth v. Drummond**, 775 A.2d 849, 856-57 (Pa. Super. 2001) (*en banc*), we noted that, by enacting section 6317, our legislature:

> not only intended to protect our children from the evils of illegal drug dealing on school grounds and on school buses, but additionally intended to protect our children from those same evils on or near the playgrounds and recreation centers, whether associated with municipal facilities, school property, or . . . semiprivate apartment complexes.

**Lewis**, 885 A.2d at 57. Thus, we held that, by incorporating such an expansive definition, the General Assembly clearly intended to include pre-schools within the contours of section 6317. **Id.** at 57-58. Additionally, we explained that "pre-school" fell within the general definition of the word "school," which the American Heritage Dictionary defines as "[a]n institution for the instruction of children or people under college age." **Id.** at 58 (quoting American Heritage Dictionary (4th ed. 2000)).

Conversely, Ali contends that the Y.W.C.A. operated a daycare, which we held in **Commonwealth v. Dixon**, 53 A.3d 839 (Pa. Super. 2012), not

to be the type of facility covered by section 6317. In ***Dixon***, we noted, as we did in ***Lewis***, that the "legislature clearly intended to segregate children from drugs where they learn and play, and to promote that policy, it created drug-free zones within a radius of schools, playgrounds, and recreational facilities." ***Dixon***, 53 A.3d at 844. However, we quickly pointed out that daycare centers are not equated to schools of any type, including pre-schools, in any other statutory scheme in Pennsylvania. ***Id.*** We also noted that, when the General Assembly amended section 6317 in 1997, it expanded the provision to include different types of schools that were entitled to protection, but did not include daycare or childcare facilities in the expansion. ***Id.*** at 845. Moreover, we noted that, when the General Assembly enacted a provision subjecting methamphetamine laboratory operators to stricter penalties when those laboratories were near schools and recreational facilities, it chose to include nursery schools and daycare facilities within that provision. ***Id.*** We concluded that "the fact that the legislature specifically denoted daycare centers in addition to schools undermines the . . . argument . . . that daycare facilities are schools *per se* for the purpose of the drug-free school zone statute." ***Id.***

Furthermore, we applied the rule of lenity, as we must in criminal cases, and invoked the venerable maxim *expressio unius est exclusio alterius*, which establishes the principle that, "where certain things are designated in a statute, all omissions should be understood as exclusions." ***Id.*** at 846 (citations and internal quotation marks omitted). In doing so, we

reinforced our holding that a daycare center is not a school for purposes of section 6317, opining that "[t]he General Assembly was more than capable of drafting § 6317 to include daycare or childcare facilities within the enumerated entities." *Id.* (citing ***Key Sav. & Loan Ass'n v. Louis John Inc.***, 549 A.2d 988, 991 (Pa. Super. 1988) ("This Court is without authority to insert a word into a statutory provision where the legislature has failed to supply it.")).

Finally, we cautioned that, "[i]f the statute was interpreted as reaching every place where children routinely learn and play, virtually every home, yard, neighborhood, street and woods would constitute a drug-free school zone and any drug offense would fall within the ambit of § 6317." *Id.* We squarely rejected such an "overly-expansive" rationale. *Id.*

Despite the parties' arguments, we need not determine definitively whether the facility operated at the Y.W.C.A. was a daycare center or a pre-school. It is clear that neither case is controlling, and that it is irrelevant whether the facility is properly viewed as a daycare center or a pre-school. The statutory language utilized in the sentencing enhancement, "public or private elementary or secondary school," is much more narrow than the expansive language used in section 6317. Nonetheless, our discussion of these two cases, particularly ***Dixon***, is relevant here, because we rely upon many of the same principles and limitations that we discussed in ***Dixon***. Upon completing that analysis, we hold that neither a daycare facility nor a

pre-school falls within the clear language contained in the school zone sentencing enhancement.

In cases involving statutory interpretation, which is a matter of law, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Wilson*, 101 A.3d 1151, 1153 (Pa. Super. 2014) (citing *Commonwealth v. Spence*, 91 A.3d 44, 46 (Pa. Super. 2014)). We apply the following principles that govern our interpretation of a statutory provision:

> When construing [provisions] utilized by the General Assembly in a statute, our primary goal is "to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). "Every statute shall be construed, if possible, to give effect to all its provisions." *Id.* However, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* § 1921(b). "Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage." *Id.* § 1903(a). In other words, if a term is clear and unambiguous, we are prohibited from assigning a meaning to that term that differs from its common everyday usage for the purpose of effectuating the legislature's intent. Additionally, we must remain mindful that the "General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." *Id.* § 1922(1).

*Commonwealth v. Cahill*, 95 A.3d 298, 301 (Pa. Super. 2014). It is axiomatic that the plain language of a statute is the best indication of the legislative intent that gave rise to the statute.

> Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in

this part, shall be construed according to such peculiar and appropriate meaning or definition.

1 Pa.C.S. § 1903(a).

As with section 6317, the school zone enhancement plainly seeks to protect our children from the evils of illegal drug dealing on school grounds. However, we may not ignore the unambiguous terms used in the enhancement so as to expand the provision to include those areas or locations that are not fairly encompassed by those terms. The enhancement applies only when the offense occurs within 250 feet of a "public or private elementary or secondary school." 204 Pa. Code. § 303.10(b)(2). No reasonable argument can be made that a pre-school or daycare facility is a secondary school, so we focus our discussion upon whether either of these two entities fall within the common definition of an elementary school.

The American Heritage College Dictionary defines "elementary school" as "[a] school for the first four to eight years of a child's formal education, often including kindergarten." American Heritage College Dictionary 452 (4th ed. 2002). It can also be defined more simply as "[t]he first four to eight years of formal education." *Id.* We are aware of no authoritative definition that is any broader. We cannot assign to the term "elementary school" a more expansive definition when that unambiguous term's meaning is so clear. To do so would be to disregard the statute's language in pursuit of its spirit.

A fair reading of the definition and common understanding of "elementary school" alone precludes a pre-school or a daycare. It becomes even more true when we consider the definition of "pre-school," a term which the American Heritage Dictionary defines as "[o]f, for, relating to, or being the early years of childhood **before** elementary school." *Id.* at 1101 (emphasis added). The term also refers to "a school for preschoolers; a nursery school." *Id.* The dictionary definitions, which provide us with the best evidence of the common understanding attributed to certain words, separate elementary schools and pre-schools based upon the relevant time period in a child's life. In other words, an elementary school does not include a pre-school, and vice-versa, because pre-school necessarily precedes elementary school. *A fortiori*, if a pre-school is not included within the term "elementary school," neither is a daycare facility. Consequently, it does not matter whether the Y.W.C.A. operated a pre-school or a daycare; neither supports the application of the sentencing enhancement.

As in *Dixon*, we are bound both by the rule of lenity, which requires us to construe penal provisions narrowly, *see* 1 Pa.C.S. § 1928(b)(1), and by the maxim *expressio unius est exclusio alterius*, as referenced above. *Dixon*, 53 A.3d at 846. Moreover, if we included these facilities within the narrow term used in subsection 303.10(b)(2), we would inflict the harm that we cautioned against, and resoundingly rejected, in *Dixon*, that "every place where children routinely learn and play, virtually every home, yard, neighborhood, street and woods would constitute a drug-free school zone

and any drug offense [would implicate the sentencing enhancement.]" ***Dixon***, 53 A.3d at 846. As we explained in ***Dixon***, if the General Assembly wanted to include such facilities within the parameters of the enhancement, it was capable of doing so. It chose not to, and we lack the authority "to insert a word into a statutory provision where the legislature has failed to supply it." ***Louis John***, 549 A.2d at 991.

We hold that the term "elementary school" encompasses neither a pre-school nor a daycare. Therefore, the trial court erred in considering the inapplicable school zone enhancement in sentencing Ali.

Finally, we address Ali's claim that the trial court erred in considering the youth enhancement when fashioning Ali's sentence. We agree with Ali that the trial court should not have considered that enhancement.

As noted earlier, the youth enhancement requires a trial court to consider elevated sentencing guideline ranges when "the court determines that the offender distributed a controlled substance to a person or persons under the age of 18." 204 Pa. Code § 303.10(b)(1). Among the crimes for which Ali was convicted were two counts of possession with intent to deliver/delivery of a controlled substance to Harper, who was under eighteen on the relevant date. It bears repeating that all parties agree that Ali did not actually sell K2 to either of these individuals on May 21, 2012, the date of the fatal accident. It also is undisputed that Ali was convicted of these charges based upon a theory of accomplice liability. Thus, the question becomes whether an accomplice is an "offender" for purposes of the youth

enhancement. We hold that an accomplice is not an offender in this limited circumstance.

Many of the same principles that we applied in our school zone enhancement analysis apply with equal force in this discussion. We must abide by our rules of statutory construction, interpreting the unambiguous term "offender" as used in this provision according to its common understanding, and without ignoring that meaning in order to effectuate the intent of the provision. *See Cahill*, 95 A.3d at 301; 1 Pa.C.S. § 1903(a). Moreover, we must construe the manifestly penal provision in accordance with the rule of lenity. *See* 1 Pa.C.S. § 1928(b)(1). We also must bear in mind that the legislature has the ability to define and include terms according to its will, and the absence of a term or definition creates the presumption that the term intentionally was omitted. *Dixon*, 53 A.3d at 846.

We have found no case law defining the term "offender" as used in the youth enhancement. Black's Law Dictionary defines an "offender" as "a person who has committed a crime." Black's Law Dictionary 1110 (8th ed. 2004). Notably, the definition refers only to the primary actor in a crime, and not to an accomplice or a conspirator. In Pennsylvania, "[a] person is an accomplice of another person in the commission of an offense if . . . with the intent of promoting or facilitating the commission of the offense, he . . . solicits such other person to commit it . . . or aids or agrees or attempts to aid such other person in planning or committing it." 18 Pa.C.S.

§ 306(c)(1)(i-ii). Hence, under the common understanding of the relevant terms and provisions, an offender and an accomplice are distinct actors. We find no basis upon which to conclude that the usage of one term necessarily subsumes the other. To the contrary, the rule of lenity requires us to construe these terms narrowly; that is, we must conclude that the use of the word "offender" does not incorporate the concept of accomplice liability. We find no indicia within the normal, everyday understanding of the terms or in the body or context of the sentencing enhancement provisions that would enable us to conclude that "offender" includes a primary actor's accomplices, as the Commonwealth urges us to do.

This conclusion is consistent with the established principle that sentencing enhancements apply only to principal crimes and not to inchoate crimes. *Commonwealth v. Adams*, 760 A.2d 33, 39 (Pa. Super. 2000) (citing Description following Guideline Text § 303.10(b) of Sentencing Guidelines Implementation Manual, 6/13/1997, 5th Ed. at 201) (recognizing that the youth and school zone enhancements do not apply to inchoate crimes). Although the inchoate crimes and accomplice liability differ in some ways, we nonetheless find no logical basis upon which to distinguish the two in this context. If a conspirator is not subject to enhanced sentencing guidelines for the foreseeable acts of his co-conspirator, the same must be true for an accomplice relative to the principal offender. Had the General Assembly wished to include accomplices either within the term "offender" or within the reach of the youth enhancement, it had the authority and ability

to do so. Because it chose not to do so, we must interpret the provision to exclude accomplices.

Instantly, Ali was not the actual offender for purposes of the youth enhancement. The record is abundantly clear that Himed, not Ali, delivered the K2 to Harper and/or Crawford on May 21, 2012. Consequently, the trial court erred and abused its discretion in considering the youth enhancement when fashioning Ali's sentence.

In sum, we reject Ali's trial-related claims. We also reject Ali's claim that application of the youth and school zone enhancements are unconstitutional pursuant to *Alleyne*. However, we hold that the trial court erred by permitting the Commonwealth to introduce irrelevant victim impact testimony and by considering the two sentencing enhancements in fashioning Ali's sentence. Accordingly, we vacate the judgment of sentence and remand for a new sentencing proceeding in accordance with this opinion.[4]

Judgment of sentence vacated. Case remanded for new sentence. Jurisdiction relinquished.

---

[4] We also note that Ali also has raised a general challenge to the discretionary aspects of his sentence, in which he argues that his overall sentence was unreasonable and unduly excessive. *See* Brief for Ali at 33-34. Because we order a new sentence, this issue is now moot.

- 40 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/5/2015