J-S43010-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| SHAKOOR R. TRAPP | |
| Appellant | No. 1493 MDA 2015 |

Appeal from the Judgment of Sentence April 8, 2015
In the Court of Common Pleas of Lycoming County
Criminal Division at No(s): CP-41-CR-0000866-2011

BEFORE:  GANTMAN, P.J., PANELLA, J., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED JULY 13, 2016**

Appellant, Shakoor R. Trapp, appeals from the judgment of sentence entered in the Lycoming County Court of Common Pleas, following his jury trial convictions of attempted homicide, aggravated assault, burglary, criminal trespass, possessing an instrument of crime, recklessly endangering another person, and simple assault.[1] We affirm.

In its opinions, the trial court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

---

[1]  18 Pa.C.S.A. §§ 901, 2702, 3502, 3503, 907, 2705, and 2701, respectively.

> WHETHER THE WEIGHT OF THE EVIDENCE WAS SUFFICIENT TO SUSTAIN CONVICTIONS ON ALL CHARGES?
>
> WHETHER THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A VERDICT OF GUILTY AS TO ALL CHARGES?
>
> WHETHER THE TRIAL COURT ERRED IN GRANTING THE COMMONWEALTH'S MOTION *IN LIMINE* TO PRECLUDE THE INTRODUCTION OF APPELLANT'S EXPERT WITNESS REGARDING WITNESS' IDENTIFICATION OF APPELLANT?
>
> WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE SENTENCE IMPOSED UPON [APPELLANT] WAS NOT EXCESSIVE IN NATURE?
>
> WHETHER THE SENTENCE MUST BE VACATED BECAUSE THE TRIAL COURT RELIED UPON IMPERMISSIBLE FACTORS IN IMPOSING SENTENCE?

(Appellant's Brief at 8).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable Marc F. Lovecchio, we conclude Appellant's issues on appeal merit no relief. The trial court opinions comprehensively discuss and properly dispose of the questions presented. (**See** Trial Court Opinion, filed January 14, 2016, at 3-19; **see also** Trial Court Opinions, filed August 21, 2015 and September 5, 2014) (finding: **(1)-(2)** jury's guilty verdicts were consistent with evidence and far from shocking; following attack, Victim positively identified Appellant as assailant; Victim's identification reliably established Appellant's culpability for crimes at issue; court properly determined Appellant's convictions were supported by weight of evidence; Appellant broke into and attacked Victim

- 2 -

as she slept in her home; Victim sustained multiple stab wounds to her chest; Victim sustained gunshot wounds in her temple, cheek, and knee areas; Victim had ample opportunity to view her attacker during attack, given surrounding circumstances; neighbor's testimony placed Appellant near crime scene around time of attack; neighbor observed Appellant in possession of handgun, days before attack, that was similar to weapon Victim described; Victim positively identified Appellant as her attacker through Facebook pictures and non-suggestive photo array; Victim's in-court identification was certain; police apprehended Appellant at nearby residence hiding between ceiling joists in hot and uncomfortable area, thus demonstrating Appellant's consciousness of guilt, where Appellant did not hide before this incident, despite his other outstanding warrants; police recovered bloody sock from Appellant's residence, which contained both Appellant's and Victim's DNA; Commonwealth presented sufficient evidence to sustain Appellant's convictions; **(3)** *Commonwealth v. Walker*, 625 Pa. 450, 92 A.3d 766 (2014), allows for expert testimony regarding eyewitness accounts where Commonwealth's case is solely or primarily reliant on eyewitness evidence, but *Walker* is distinguishable; here, Victim knew Appellant and Victim's identification was not cross-racial; Victim's identification was made under non-suggestive photo-array; testimony from neighbor, physical evidence from bloody sock, videotaped admission that Appellant's sock was "probably his," and circumstances of Appellant's

apprehension show that Commonwealth's case was not solely reliant on eyewitness testimony; court did not err in granting Commonwealth's Motion *in limine* to exclude Appellant's proposed eyewitness expert witness; **(4)** court had benefit of pre-sentence investigation report, considered Appellant's prior record and troubled family history, heard from Victim, reflected on nature and circumstances of Appellant's crimes and their impact on community; court imposed sentence that was not excessive given circumstances; **(5)** deadly-weapon-used sentencing guidelines matrix is merely advisory and outside purview of **Alleyne v. United States**, ___ U.S. ___, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013);[2] deadly-weapon-used matrix was evidently applicable in this case; court retained sentencing discretion after it determined proper sentencing guideline range under deadly-weapon-used matrix; likewise, prevailing law has already rejected Appellant's constitutional challenges to deadly-weapon-used matrix).  Accordingly, we affirm on the basis of the trial court's opinions.

_____

[2] **See, e.g., Commonwealth v. Buterbaugh**, 91 A.3d 1247, 1270 n. 10 (Pa.Super. 2014) (*en banc*) (explaining that if sentencing enhancement applies, court is required to raise standard guideline range; however, court retains discretion to sentence outside guideline ranges; therefore, application of sentencing enhancements do not violate **Alleyne**). **See also Commonwealth v. Ali**, 112 A.3d 1210, 1226 (Pa.Super. 2015) (stating sentence enhancements do not bind court to impose particular sentence or compel court to sentence within specified guideline range; guidelines are advisory only, even though they contain word "shall"; enhanced guidelines do not fall under **Alleyne** holding).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/13/2016

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH : No. CR-866-2011

vs. : CRIMINAL DIVISION

SHAKOOR TRAPP, :
Appellant : 1925(a) Opinion

## OPINION IN SUPPORT OF ORDER IN COMPLIANCE WITH RULE 1925(a) OF THE RULES OF APPELLATE PROCEDURE

This opinion is written in support of this court's judgment of sentence dated April 8, 2015, which became final when the court denied Appellant Shakoor Trapp's post sentence motion on August 21, 2015. The relevant facts follow.

On May 29, 2011, an individual entered a residence at 606 Maple Street in Williamsport, Pennsylvania and assaulted a 23-year old African American female in an upstairs bedroom by stabbing, choking, and shooting her. Fortunately, she survived the attack and sought help at a neighbor's residence. After receiving medical treatment for her injuries, the victim identified Trapp as her attacker through photographs shown to her by family members and a photo array conducted by the police. The police obtained a warrant for Trapp's arrest, as well as a warrant to search his residence. When the police executed the search warrant, they found a pair of bloody socks near a couch in Trapp's living room.

Trapp was arrested and charged with attempted homicide, two counts of aggravated assault, burglary, criminal trespass, persons not to possess a firearm, possessing

1



instruments of crime, recklessly endangering another person and simple assault. Upon motion of the defense, the person not to possess charge was severed for trial purposes.

The parties stipulated that the severed firearm charge would proceed at the same proceeding to a non-jury trial and the other charges would proceed to a jury trial. The trial was held June 5-7, 2012. The jury trial ended in a mistrial, but the court convicted Trapp of the firearm charge.

Trapp filed an appeal, claiming that re-trial of the remaining charges was barred by double jeopardy. This claim, however, was rejected by the appellate courts, and the case was placed back on the trial list.

Jury selection was scheduled for August 27, 2014. The day before jury selection defense counsel requested a continuance to seek leave to hire an expert witness regarding eyewitness identification. The court denied the continuance request and a jury was selected.

Following a jury trial held September 10-12, 2014, Trapp was found guilty of attempted homicide, aggravated assault, burglary, criminal trespass, possession of instrument of a crime, recklessly endangering another person and simple assault.

On April 8, 2015, Trapp was sentenced to an aggregate period of state incarceration, the minimum of which was 32 ½ years and the maximum of which was 65 years. The aggregate sentence consisted of 20 to 40 years for attempted homicide, a felony of the first degree; 6 ½ to 13 years for Count 4, burglary, a felony of the first degree; 5 to 10 years for Count 6, persons not to possess, a felony of the second degree; and 1 to 2 years for Count 7, possessing instruments of a crime, a misdemeanor of the first degree. The sentence

2

was effective April 8, 2015 although Trapp had credit for time served from June 1, 2011 to April 7, 2015.

Trapp filed a post-sentence motion on April 17, 2015, which was argued before the court on May 26, 2015. The court issued an opinion and order denying Appellant's post sentence motion on August 21, 2015.

On September 2, 2015, Trapp filed his appeal. The court ordered Trapp to file a concise statement of matters complained of on appeal but neither he nor his counsel received a copy of the order. Upon motion of Trapp's counsel, the court granted an extension to file the concise statement in light of those circumstances. The statement was filed on October 15, 2015.

Trapp has raised five issues on appeal. First, Trapp contends that the evidence submitted at his trial was insufficient to meet the Commonwealth's burden of proving that Appellant was the actor for each offense charged in the information beyond a reasonable doubt. The court cannot agree.

In reviewing the sufficiency of the evidence, the court considers whether the evidence and all reasonable inferences that may be drawn from that evidence, viewed in a light most favorable to the Commonwealth as the verdict winner, would permit the jury to have found every element of the crime beyond a reasonable doubt. *Commonwealth v. Davido*, 582 Pa. 52, 868 A.2d 431, 435 (2005); *Commonwealth v. Murphy*, 577 Pa. 275, 844 A.2d 1228, 1233 (2004).

Moreover, the Commonwealth may sustain its burden by only circumstantial evidence and need not preclude every possibility of innocence. *Commonwealth v. Orr*, 38

3

A.3d 868, 872 (Pa. 2011), quoting *Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa. Super. 2011). "Any doubts regarding a defendant's guilt may be resolved by the factfinder unless the evidence is so weak and inconclusive that as a matter of law, no probability of fact may be drawn from the combined circumstances." *Id.*

As the court noted in its opinion and order denying Trapp's post sentence motion, the court found that there was an abundance of evidence upon which to identify Trapp as the perpetrator of the incident, which formed the basis for his convictions.

Tiffany Nixon testified that, on May 29, 2011, she was awoken in the early morning hours believing that she was being "punched" in her chest. In fact, she was being stabbed by a person that she described during the trial as being African American, wearing a white or cream colored hoodie and who looked familiar. She testified that she had seen the individual previously around the neighborhood.

The perpetrator of the offense ended up not only stabbing Ms. Nixon but also choking her and eventually shooting her in her cheek, temple and knee areas. She testified that she had an ample opportunity to identify the individual who shot her and during the trial positively identified Trapp as her assailant.

When Ms. Nixon first spoke with the police and immediately following her attack, she testified that she was not thinking clearly. She was confused, scared and in pain. Furthermore, she worried about her physical condition and most of all about her children. As a result, she was unable to provide any specifics regarding her assailant to the police.

Ms. Nixon was transported by ambulance to the Williamsport Hospital Emergency Room where she was assessed and life-flighted by helicopter to Geisinger

4

Medical Center. She underwent emergency treatment, was admitted to the Intensive Care Unit and was intubated.

She started writing notes as her recollection of what occurred became clearer and as she testified "her memory got better." Among other things, she recalled that the attacker wore a white or cream-colored hoodie and shot her with a small silver gun.

Her sister visited her in the hospital and based upon information her sister had received from others, she showed Ms. Nixon three photographs obtained from Facebook of three individuals. One of the photographs was of Trapp. According to Ms. Nixon, the photos jogged her memory and she recognized Trapp as her attacker.

Subsequently, Ms. Nixon identified Trapp from a photo array that had been presented to her by the Williamsport Police. Without any suggestions being made to her, she quickly picked out Trapp and identified him as her attacker. The photo array picture of Trapp was not the same Facebook photograph she had previously recognized.

According to Ms. Nixon, there was no doubt in her mind that Trapp was the individual who attacked her. She had previously seen Trapp "quite often" outside of where she resided smoking cigarettes.

During her testimony, Ms. Nixon positively identified Trapp as her attacker.

Officer Levan of the Williamsport Bureau of Police confirmed that when he first contacted Ms. Nixon immediately following the attack, she was hysterical, crying obsessively, frantic, absolutely upset, unsteady and suffering from a gross amount of blood loss.

Agent Eric Delker of the Williamsport Bureau of Police confirmed the

5

victim's testimony with respect to the photo array. He indicated that when he presented the array to Ms. Nixon, there was nothing suggestive about it and he asked that she look at it closely to determine if there was anyone who she recognized. Ms. Nixon identified Trapp and indicated that she was absolutely sure that he was the individual who had stabbed her and shot her.

A neighbor, Shana Saunders, testified that a few nights before the attack, she had an encounter with Trapp. She heard that Trapp fired a handgun and saw him with a small silver gun similar to that testified to by the victim. Trapp asked Ms. Saunders not to tell anyone what she observed. Ms. Saunders also saw Trapp in front of his apartment, a few doors from the victim's apartment, only a few hours prior to the attack.

Agent Leonard Dincher of the Williamsport Bureau of Police indicated that following Ms. Nixon's identification of Trapp and further investigation, a warrant was issued for Trapp's arrest. He obtained information that Trapp was at 523 High Street. He and other police officers searched the residence and eventually found Trapp hiding from the police by lying between ceiling joists in the rafters below the roof. Trapp was attempting to evade apprehension by hiding in an area of the home that was very inaccessible and in an area that was extremely hot with no ventilation whatsoever.

As well, a pair of bloody socks was located at Trapp's residence. The blood on the socks was tested and a DNA expert testified that the DNA in the blood was consistent with that of Ms. Nixon. The expert opined that the chances of the blood being similar to the DNA of another person were extremely small.

The court concludes that there was sufficient evidence for which the jury

could identify Trapp as the perpetrator of the offenses.

Ms. Nixon positively identified Trapp as her attacker to her sister while at Geisinger, to Agent Delker at a non-suggestive photo array while at Geisinger, and in court. All of these identifications were immediate and sure. There was no hesitancy whatsoever. Ms. Nixon's failure to provide specifics immediately following the attack and during the few days after the attack does not cause the court to doubt her identification. Indeed, given the vicious nature of the attack, the injuries suffered by the victim and the victim's stated concerns, is entirely logical that her recall of the event and the identity of her attacker became clearer in the days immediately following the incident. Furthermore, there is nothing at all suggestive about the identifications. The cell phone "Facebook" identification was one out of three separate pictures with no testimony whatsoever that any suggestiveness was present. The photo of Trapp in the photo array was one out of eight pictures that included a different picture of Trapp than what was presented to her by her sister. The victim was familiar with Trapp through his presence in the area on previous occasions. Furthermore, the victim clearly had an opportunity to observe her attacker during the incident.

Second, Ms. Saunders' testimony places Trapp near the scene at the time of the incident and immediately prior to it. She also observed Trapp in possession of a similar handgun at that time.

Third, Trapp hiding from the police between ceiling joists of an attic lying in insulation in a dark and hot area is certainly consciousness of guilt. The suggestion that he was hiding as a result of a prior warrant was not accepted by the jury. Incidentally, prior to the attack on the victim, Trapp was not evading the police and in fact openly walked around

7

in public until the incident.

Finally, the bloody socks in Trapp's residence which contained Ms. Nixon's DNA also strongly support Trapp's guilt. Trapp wore socks with grey toes and grey heels, similar to the socks found in his residence. Viewing the socks, there were areas of blood that had spattered and/or dropped on the socks and perhaps other areas in which the perpetrator, while wearing the socks, stepped in blood. As well, there were photographs of the crime scene, which showed blood spatters and even some pools of blood.

Trapp also asserts that the verdict was against the weight of the evidence. A weight of an evidence claim enables a judge to reverse the verdict only when it is so contrary to the evidence as to shock one's sense of justice and the reward of a new trial is imperative so that right may be given another opportunity to prevail. *Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24, 39 (2011), citing *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 652-53 (2008). "The weight of the evidence is exclusively for the finder of fact who is free to believe all, part or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Small*, 559 Pa. 423, 435, 741 A.2d 666, 672 (1999), cert. denied, 531 U.S. 829, 121 S. Ct. 80 (2000).

Clearly in light of the above evidence, the jury's verdict did not shock the court's conscious. In fact, the jury's conclusion was similar to that as set forth by the court in its opinion, verdict and order filed on June 14, 2012 finding Trapp guilty of persons not to possess a firearm.

Next, Trapp claims the court erred in granting the Commonwealth's motion in limine to preclude the introduction of Trapp's expert witness regarding the witness's

identification of Trapp.

On August 27, 2014, defense counsel contacted Dr. Jonathan Vallano about providing expert testimony on eyewitness identification in this case. On September 1, 2014, Dr. Vallano submitted a letter to defense counsel that described his prospective testimony regarding eyewitness memory issues. As September 1 was Labor Day and the courthouse was closed, defense counsel reviewed the letter and provided a copy to the prosecuting attorney via email on September 2, 2014. The Commonwealth immediately filed a motion to preclude the expert testimony, because its case was neither solely nor primarily dependent on eyewitness identification, a Frye hearing had not been held to determine the admissibility of the proposed expert testimony in this case, and the Commonwealth did not have sufficient time before trial commenced to secure the services of its own expert.

The court held an argument on the motion on September 4, 2014. The argument focused on the reasons for defense counsel's delay in seeking and obtaining the expert testimony and whether this case is one in which expert testimony regarding eyewitness identification is admissible.

Prior to May 28, 2014, expert testimony on the subject of eyewitness identification was per se inadmissible in Pennsylvania. On May 28, 2014, in the case of *Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014), however, the Pennsylvania Supreme Court held that the admission of expert testimony regarding eyewitness identification is no longer per se inadmissible; rather, the admissibility of such evidence is left to the discretion of the trial court. This does not mean that such testimony would be admissible in every case, though. The Court stated:

9

Initially, we envision that allowing such expert testimony would be limited to certain cases. As discussed below, such testimony would only be permitted where relevant. Pa.R.E. 401. While we need not precisely define such situations, generally speaking, it would be where the Commonwealth's case is solely or primarily dependent upon eyewitness testimony.

92 A.3d at 787.

Trapp argued that expert testimony is admissible in this case because the case is based primarily on eyewitness testimony. He asserted that the bloody socks found in his residence were not enough to render the proposed expert testimony inadmissible because, but for the eyewitness identification of Trapp, his residence would not have been searched and the socks would never have been found. Furthermore, the socks were "in question" because his door had been kicked in sometime before the police arrived, which supported his argument that the real perpetrator planted the socks in his residence.

The Commonwealth argued that *Walker* was distinguishable because the sole evidence was the eyewitness identification and the perpetrator was a stranger of a race different than the person who was assaulted. The Commonwealth also noted that its case was not based only on the eyewitness testimony of the victim. The Commonwealth pointed out that it also had two pieces of DNA evidence, the testimony of a neighbor that tended to corroborate the victim's identification, a videotaped statement in which Trapp admitted that the sock was probably his, and the fact that the police found Trapp hiding in an attic for no good reason.

The court agreed with the Commonwealth that the facts of *Walker* were distinguishable. This case did not involve a complete stranger or a cross-racial identification.

10

Although the victim did not know Trapp by name, she had seen him previously around the neighborhood. More importantly, this case was not solely or primarily dependent on eyewitness identification testimony.

At the previous trial, the victim testified that on May 29, 2011, she was awoken in the early morning hours believing that she was being "punched" in her chest. In fact, she was being stabbed by a person who she described during the trial as being African American, wearing a white or cream colored hoodie and who looked familiar. She testified that she had seen the individual previously around the neighborhood.

The perpetrator of the offense ended up not only stabbing Ms. Nixon but also choking her and eventually shooting her in her cheek, temple area and knee.

The victim testified that she had an ample opportunity to identify the individual who shot her and during the trial positively identified the Trapp as her assailant.

When the victim first spoke with the police immediately following her attack, she testified that she was not thinking clearly. She was confused, scared and in pain. Furthermore, she was worried about her physical condition and most of all about her children. As a result, she was unable to provide any specifics regarding her assailant to the police.

The victim was transported by ambulance to the Williamsport Emergency Room where she was assessed and then life-flighted by helicopter to Geisinger Medical Center. She underwent emergency treatment, was admitted to the Intensive Care Unit and was intubated.

The victim started writing notes as her recollection of what occurred became

11

clearer and as she testified her "memory got better." Among other things, she recalled that the attacker wore a white or cream colored hoodie and shot her with a small silver gun.

Her sister visited her in the hospital and, based upon information her sister had received from others, she showed Ms. Nixon three photographs obtained from Facebook of three different individuals. One of the photographs depicted Trapp. According to the victim, the photos jogged her memory and she recognized Trapp as her attacker.

Subsequently, the victim identified Trapp from a photo array that had been presented to her by the Williamsport Police. Without any suggestions being made to her, she quickly picked out Trapp and identified him as her attacker. The photo array picture of Trapp was not the same Facebook photograph she had previously recognized.

According to the victim, there was no doubt in her mind that Trapp was the individual who attacked her. She had previously seen Trapp "quite often" outside of where she resided smoking cigarettes. During her testimony, the victim positively identified Trapp as her attacker.

Officer Levan of the Williamsport Bureau of Police confirmed that when he first contacted the victim immediately following the attack, she was hysterical, crying obsessively, frantic, "absolutely" upset, unsteady and suffering from a "gross amount" of blood loss.

Agent Eric Delker of the Williamsport Bureau of Police confirmed the victim's testimony with respect to the photo array. He indicated that when he presented the array to her, there was nothing suggestive about it and he asked that she look at it closely to determine if there was anyone who she recognized. She identified Trapp and indicated that

12

she was absolutely sure that he was the individual who attacked her and shot her.

A neighbor, Shana Saunders, testified that a few nights before the attack she had an encounter with Trapp. She heard Trapp fire a handgun and saw him with a small silver gun. Trapp asked Ms. Saunders not to tell anyone what she observed. Ms. Saunders also saw Trapp in front of his apartment, a few doors from the victim's apartment, only a few hours prior to the attack.

Agent Leonard Dincher of the Williamsport Bureau of Police indicated that following the victim's identification of Trapp and further investigation, a warrant was issued for Trapp's arrest. He obtained information that Trapp was at 523 High Street. He and other police officers searched the residence and eventually found Trapp lying between ceiling joists in the rafters below the roof hiding from the police. Trapp was attempting to evade apprehension by hiding in an area of the home that was very inaccessible and in an area that was extremely hot with no ventilation whatsoever.

A search warrant was obtained for Trapp's residence and a pair of bloody socks was found in the living room. The blood stain was tested and a DNA expert testified that the DNA in the blood was consistent with that of the victim. The expert opined that the chances of the blood being similar to the DNA of another person were extremely small.

There were hairs and other material on the sock which initially were not submitted for DNA analysis. This evidence subsequently was submitted for DNA analysis and Trapp's DNA was discovered on the sock.

It was clear from the Pennsylvania Supreme Court opinion in *Walker* that the Court did not envision expert testimony regarding eyewitness identification would be

13

admissible in every case or even in thousands of cases. The court found that the notes from the victim referencing a white or cream colored hoodie and a small silver gun, the supporting testimony from the neighbor, the bloody sock with both the victim's and Trapp's DNA on it, Trapp's videotaped statement that the sock was probably his and the evidence of Trapp's consciousness of guilt, were sufficient to show that the Commonwealth's case was not primarily dependent upon eyewitness testimony.

Trapp also avers that the court's sentence was excessive. "Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Bricker*, 41 A.3d 872, 875 (Pa. Super. 2012), quoting *Commonwealth v. Cunningham*, 805 A.2d 566, 575 (Pa. Super. 2002). "[A]n abuse of discretion is more than a mere error of judgement; thus, a sentencing court will not have abused its discretion unless 'the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.'" *Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d 957, 961 (2007), quoting *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996).

"In determining whether a sentence is manifestly excessive, the appellate court must give great weight to the sentencing court's discretion, as he or she is in the best position to measure factors such as the nature of the crime, the defendant's character, and the defendant's display of remorse, defiance, or indifference. *Commonwealth v. Colon*, 102 A.3d 1033, 1043 (Pa. Super. 2014), quoting *Commonwealth v. Mouzon*, 828 A.2d 1126, 1128 (Pa. Super. 2003).

Trapp has not alleged that the judgment exercised by the court was manifestly

14

unreasonable or the result of partiality, prejudice, bias or ill-will. Trapp has only alleged that the court did not accept his arguments as to why the sentence should be less than what was imposed.

The court had the benefit of a presentence investigation and discussed it at the sentencing hearing. The court noted that Trapp was 27 years old and had a ninth grade education. He was married and had three children. He maintained his innocence and claimed that he was assaulted in prison by one of the victim's family members, who allegedly said that he knew Trapp did not do it but that Trapp knew who did.

The court discussed Trapp's extensive prior juvenile and adult record, including adjudications of delinquency for simple assault, criminal mischief, terroristic threats, a felony one robbery and possession of instruments of crime. Trapp also had adult convictions for possession of a small amount of marijuana and aggravated harassment by a prisoner. There was some confusion over indecent assault and unlawful restraint convictions where the offense occurred when Trapp was a juvenile but the convictions were reflected as adult convictions in 2009, so the court did not consider those offenses when sentencing Trapp.

Trapp's prior record score was a five based on his four-point felony one robbery adjudication as a juvenile and his conviction for aggravated harassment by a prison, which was graded as a felony of the third degree. Trapp's misdemeanor adjudications of delinquency did not count toward his prior record score, but they did shed light on Trapp's character and prior attempts at rehabilitation. Four of Trapp's sentences or dispositions of probation were revoked and he was resentenced.

15

The court also noted Trapp's family history and troubled upbringing. Trapp indicated to the writer of the pre-sentence investigation that his parents were crack addicts and he bounced from house-to-house, living with his paternal grandmother, then his maternal grandmother, then an uncle, and then juvenile facilities and foster care. He had no stability or structure.

Trapp also reported that he had a diagnosis of bipolar and depression as an eight year old. He was prescribed all sorts of medications, but stopped taking them when he was 17 years old because they made him feel sluggish and hungry.

The court heard from the victim, Ms. Nixon, at the sentencing hearing. She indicated the following: Trapp tried to take her away from her kids, family and friends, but he failed; the past four years had been rough, with many sleepless nights; Trapp hurt not only her, but her kids as well; and Trapp deserved every single day to sit and rot in prison.

The court considered the nature and circumstances of the crimes. The crimes were nightmarish and horrific. A young woman, asleep in her residence, was awoken by someone trying to kill her. She initially thought someone was punching her, but then she realized that she was being stabbed in the chest. She also was choked and shot in her face and in her knee. Ms. Nixon's two children were in the house, and one of them saw the incident. A family was traumatized by a random, senseless act of violence that was planned, purposeful and heinous.

The crime also had an impact on the community. Random acts of violence such as this make people worried and scared. They do not feel safe in their own homes. No civilized society condones or approves of this type of behavior. Even Vikings, who were

16

considered barbarians, did not do these types of things to each other, but only their enemies. Merely because the courtroom was not jammed with clamoring members of the public does not mean that the crime had no impact on the community. Furthermore, as noted by Trapp in his post sentence motion, the media was present and reported about this crime.

The court considered Trapp's history and characteristics. The court acknowledged that to a significant degree Trapp was a product of his environment, but that did not excuse or justify what he did. He was a product of his choices as well. He didn't commit this offense in a drug induced rage or steal to survive living on the streets. Instead, this was a choice to try to kill this woman and to be her and her children's nightmare for the rest of their lives.

In addition to his prior criminal history, Trapp had a history of misconducts while he was incarcerated on these offenses. Trapp's prior record and history of misconducts showed the court a man who couldn't abide by the rules as a juvenile, couldn't abide by the rules as a free adult, and couldn't abide by the rules in prison either. The court also noted that this incident didn't happen when Trapp was 18 or 19 years old.

The court considered the gravity of the offense with respect to the impact on the victim and the community. Although the victim's physical injuries have healed and are now scars that will eventually fade, the victim is lucky to be alive. The psychological impact of this trauma on her and her children likely will be with them for the rest of their lives.

After considering all of these things, the court concluded that Ms. Nixon and her family needed peace, the community needed protection from this type of conduct, and Trapp needed incarceration and supervision for a long, long time. Therefore, the court

imposed an aggregate sentence of 32 ½ to 65 years of incarceration.

Trapp's final issue on appeal is the sentence must be vacated because the court relied upon impermissible factors in imposing sentence. Trapp does not specify the impermissible factors in his concise statement. The court, however, assumes that Trapp is making the same arguments that he made in his post sentence motion. In that motion, Trapp asserted that the deadly weapon used matrix as set forth in the guidelines was unconstitutional in light of the *Alleyne* decision[1] or, in the alternative, the deadly weapon enhancement was vague and overbroad.

There was no basis whatsoever in law to support Trapp's arguments. The sentencing guidelines are advisory only and clearly outside the purview of *Alleyne*. *Commonwealth v. Ali*, 112 A.3d 1210, 1226 (Pa. Super. 2015); *Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1269 n.10 (Pa. Super. 2014). As well, the vague and overbroad argument has been previously addressed and rejected. See *Commonwealth v. McKeithan*, 350 Pa. Super. 160, 504 A.2d 294, 300-301 (1986).

While the court had no discretion as to whether it would apply § 303.4 and add at least twelve (12) months and up to twenty-four (24) months to the standard sentencing guideline range since Trapp possessed a deadly weapon during the commission of an offense, it did have the discretion in imposing a sentence after it had determined the proper sentencing guideline range. *Commonwealth v. Bowen*, 417 Pa. Super. 340, 612 A.2d 512 (1992), quoting *Commonwealth v. Dotzman*, 558 A.2d 1312, 1317 (Pa. Super. 1991). The facts and circumstances of this case, however, clearly warranted the imposition of a deadly weapon

---

[1] *Alleyne v. United States*, 133 S.Ct. 2151 (U.S. 2013).

enhancement. Trapp not only shot Ms. Nixon, he stabbed her as well. Certainly, if any case deserved imposition of the deadly weapon enhancement, this one did.


DATE: _1 - 14 - 2016_                By The Court,


Marc F. Lovecchio, Judge


cc:     Melissa Kalaus, Esquire (ADA)
        Grata Davis, Esquire (APD)
        ✓ Work file
        Gary Weber, Esquire (Lycoming Reporter)
        Superior Court (original & 1)

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH :
:
vs. : No. CR-866-2011
:
SHAKOOR TRAPP, :
Defendant : Post – Sentence Motion

## OPINION AND ORDER

By Information filed on July 21, 2011, Defendant was charged with numerous criminal offenses, the most serious of which were criminal attempt – homicide and aggravated assault. Following a lengthy jury trial, Defendant was found guilty of attempted murder, aggravated assault, burglary, criminal trespass, possession of instrument of a crime, recklessly endangering another person and simple assault. On April 8, 2015, Defendant was sentenced to an aggregate period of state incarceration, the minimum of which was 32 ½ years and the maximum of which was 65 years.

The aggregate sentence consisted of 20 to 40 years for attempted homicide, a felony of the first degree; 6 ½ to 13 years for Count 4, burglary, a felony of the first degree; 5 to 10 years for Count 6, persons not to possess, a felony of the second degree; and 1 to 2 years for Count 7, possessing instruments of a crime, a misdemeanor of the first degree. The sentence was effective April 8, 2015 although Defendant had credit for time served from June 1, 2011 to April 7, 2015. Defendant filed a post-sentence motion on April 17, 2015, which was argued before the court on May 26, 2015.

Defendant raises several issues in his post-sentence motion. First, Defendant

1

claims that the evidence was insufficient to meet the Commonwealth's burden of proof for all of the offenses charged. Second, Defendant argues that the verdict was against the weight of the evidence with respect to all of the charges. Third, Defendant argues that the Court erred in granting the Commonwealth's Motion in Limine to preclude the introduction of Defendant's expert witness regarding the witness's identification of Defendant. Next, Defendant asserts that the sentence was excessive and, in conjunction with such, Defendant also argues that the court relied upon impermissible factors in imposing its sentence.

In connection with both the sufficiency of evidence and weight arguments, Defendant contends that the testimony and other evidence produced by the Commonwealth failed to meet the appropriate legal standard to identify Defendant as the perpetrator of the offenses. The parties obviously concede that in order for Defendant to be found guilty there must be sufficient evidence to establish his identity as the perpetrator of the crime. Identity may be established by both direct and circumstantial evidence.

In reviewing the sufficiency of the evidence, the court considers whether the evidence and all reasonable inferences that may be drawn from that evidence, viewed in a light most favorable to the Commonwealth as the verdict winner, would permit the jury to have found every element of the crime beyond a reasonable doubt. *Commonwealth v. Davido*, 582 Pa. 52, 868 A.2d 431, 435 (2005); *Commonwealth v. Murphy*, 577 Pa. 275, 844 A.2d 1228, 1233 (2004).

Moreover, the Commonwealth may sustain its burden by only circumstantial evidence and need not preclude every possibility of innocence. *Commonwealth v. Orr*, 38

2

A.3d 868, 872 (Pa. 2011), quoting *Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa. Super. 2011). "Any doubts regarding a defendant's guilt may be resolved by the factfinder unless the evidence is so weak and inconclusive that as a matter of law, no probability of fact may be drawn from the combined circumstances." *Id*.

The court finds that there was an abundance of evidence upon which to identify the Defendant as the perpetrator of the incident, which formed the basis for Defendant's convictions.

Tiffany Nixon testified that, on May 29, 2011, she was awoken in the early morning hours believing that she was being "punched" in her chest. In fact, she was being stabbed by a person that she described during the trial as being African American, wearing a white or cream colored hoodie and who looked familiar. She testified that she had seen the individual previously around the neighborhood.

The perpetrator of the offense ended up not only stabbing Ms. Nixon but also choking her and eventually shooting her in her cheek, temple and knee areas. She testified that she had an ample opportunity to identify the individual who shot her and during the trial positively identified Defendant as her assailant.

When Ms. Nixon first spoke with the police and immediately following her attack, she testified that she was not thinking clearly. She was confused, scared and in pain. Furthermore, she worried about her physical condition and most of all about her children. As a result, she was unable to provide any specifics regarding her assailant to the police.

Ms. Nixon was transported by ambulance to the Williamsport Emergency

3

Room where she was assessed and life-flighted by helicopter to Geisinger Medical Center. She underwent emergency treatment, was admitted to the Intensive Care Unit and was intubated.

She started writing notes as her recollection of what occurred became clearer and as she testified "her memory got better." Among other things, she recalled that the attacker wore a white or cream-colored hoodie and shot her with a small silver gun.

Her sister visited her in the hospital and based upon information her sister had received from others, she showed Ms. Nixon three photographs obtained from Facebook of three individuals. One of the photographs was of Defendant. According to Ms. Nixon, the photos jogged her memory and she recognized Defendant as her attacker.

Subsequently, Ms. Nixon identified Defendant from a photo array that had been presented to her by the Williamsport Police. Without any suggestions being made to her, she quickly picked out Defendant and identified him as her attacker. The photo array picture of Defendant was not the same Facebook photograph she had previously recognized.

According to Ms. Nixon, there was no doubt in her mind that Defendant was the individual who attacked her. She had previously seen Defendant "quite often" outside of where she resided, among other things, smoking cigarettes.

During her testimony, Ms. Nixon positively identified Defendant as her attacker.

Officer Levan of the Williamsport Bureau of Police confirmed that when he first contacted Ms. Nixon immediately following the attack, she was hysterical, crying

4

obsessively, frantic, absolutely upset, unsteady and suffering from a gross amount of blood loss.

Agent Eric Delker of the Williamsport Bureau of Police confirmed the victim's testimony with respect to the photo array. He indicated that when he presented the array to Ms. Nixon, there was nothing suggestive about it and he asked that she look at it closely to determine if there was anyone who she recognized. Ms. Nixon identified Defendant and indicated that she was absolutely sure that he was the individual who had stabbed her and shot her.

A neighbor, Shana Saunders, testified that a few nights before the attack, she had an encounter with Defendant. She heard that Defendant fired a handgun and saw him with a small silver gun similar to that testified to by the victim. Defendant asked Ms. Saunders not to tell anyone what she observed. Ms. Saunders also saw Defendant in front of his apartment, a few doors from the victim's apartment, only a few hours prior to the attack.

Agent Leonard Dincher of the Williamsport Bureau of Police indicated that following Ms. Nixon's identification of Defendant and further investigation, a warrant was issued for Defendant's arrest. He obtained information that Defendant was at 523 High Street. He and other police officers searched the residence and eventually found Defendant hiding from the police by lying between ceiling joists in the rafters below the roof. Defendant was attempting to evade apprehension by hiding in an area of the home that was very inaccessible and in an area that was extremely hot with no ventilation whatsoever.

As well, a pair of bloody socks was located at Defendant's residence. The blood on

5

the socks was tested and a DNA expert testified that the DNA in the blood was consistent with that of Ms. Nixon. The expert opined that the chances of the blood being similar to the DNA of another person were extremely small.

The court concludes that there was sufficient evidence for which the jury could identify the Defendant as the perpetrator of the offenses.

Ms. Nixon positively identified Defendant as her attacker to her sister while at Geisinger, to Agent Delker at a non-suggestive photo array while at Geisinger, and in court. All of these identifications were immediate and sure. There was no hesitancy whatsoever. Ms. Nixon's failure to provide specifics immediately following the attack and during the few days after the attack does not cause the court to doubt her identification. Indeed, given the vicious nature of the attack, the injuries suffered by the victim and the victim's stated concerns, is entirely logical that her recall of the event and the identity of her attacker became clearer in the days immediately following the incident. Furthermore, there is nothing at all suggestive about the identifications. The cell phone "Facebook" identification was one out of three separate pictures with no testimony whatsoever that any suggestiveness was present. The photo of Defendant in the photo array was one out of eight pictures that included a different picture of Defendant than what was presented to her by her sister. The victim was familiar with Defendant through his presence in the area on previous occasions. Furthermore, the victim clearly had an opportunity to observe her attacker during the incident.

Second, Ms. Saunders' testimony places Defendant near the scene at the time

6

of the incident and immediately prior to it. She also observed Defendant in possession of a similar handgun at that time.

Third, Defendant hiding from the police between ceiling joists of an attic lying in insulation in a dark and hot area is certainly consciousness of guilt. The suggestion that he was hiding as a result of a prior warrant was not accepted by the jury. Incidentally, prior to the attack on the victim, Defendant was not evading the police and in fact openly walked around in public until the incident.

Finally, the bloody socks in Defendant's residence which contained Ms. Nixon's DNA also strongly support the Defendant's guilt. Defendant wore socks with grey toes and grey heels, similar to the sock found in his residence, on him when he was arrested. Viewing the socks, there were areas of blood that had spattered and/or dropped on the socks and perhaps other areas in which the perpetrator while wearing the socks stepped in blood. As well, there were photographs of the crime scene, which showed blood spatters and even some pools of blood.

A weight of an evidence claim enables a judge to reverse the verdict only when it is contrary to the evidence as to shock one's sense of justice and the reward of a new trial is imperative so that right may be given another opportunity to prevail. *Commonwealth v. Sanchez*, 614 Pa. 1, 36 A.3d 24, 39 (2011), citing *Commonwealth v. Blakeny*, 596 Pa. 510, 946 A.2d 645, 652-53 (2008). "The weight of the evidence is exclusively for the finder of fact who is free to believe all, part or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Small*, 559 Pa. 423, 435, 741 A.2d 666, 672 (1999),

7

cert. denied, 531 U.S. 829, 121 S. Ct. 80 (2000).

Clearly in light of the above evidence, the jury's verdict did not shock the court's conscious. In fact, the jury's conclusion was similar to that as set forth by the court in its opinion, verdict and order filed on June 14, 2012 finding Defendant guilty of persons not to possess a firearm.

At trial, the defense sought to admit the expert testimony of Jonathan P. Vallano, Ph. D, a legal psychologist and assistant professor of psychology at the University of Pittsburgh at Greensburg. The Commonwealth filed a motion in limine to preclude the introduction of Dr. Vallano's testimony and the court granted the Commonwealth's motion pursuant to an opinion and order dated September 4, 2014. The defense concludes that the court erred in that opinion.

The court disagrees with Defendant and incorporates its opinion and order that was dated September 4, 2014 but filed on September 5, 2014.

As the court noted, it is clear from the Pennsylvania Supreme Court decision in *Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014), that the Supreme Court did not envision that expert testimony regarding eyewitness identification would be admissible in every case. The court finds that the notes from the victim referencing a white or cream-colored hoodie and a small silver gun, the supporting testimony from the neighbor, the bloody sock with both the victim's and Defendant's DNA on it, Defendant's videotaped statement that the sock was probably his and the evidence of Defendant's consciousness of guilt are sufficient to show the Commonwealth's case was not primarily dependent upon

8

eyewitness testimony.

Defendant avers next that the sentence of 32 ½ years to 65 years of state incarceration was excessive. It is unclear as to why Defendant claims the sentence was excessive other than that the Court did not agree with defense argument that the sentence should be low in light of the Defendant's age, his alleged likelihood of becoming rehabilitated, his initial involvement in treatment, that there was no evidence as to impact on the community and that it was inconsistent with "like and similar cases in Lycoming County."

"Sentencing is a matter vested in the sound discretion of the Sentencing Judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Bricker*, 41 A.3d 872, 875 (Pa. Super. 2012), quoting *Commonwealth v. Cunningham*, 805 A.2d 566, 575 (Pa. Super. 2002). "[A]n abuse of discretion is more than a mere error of judgement; thus, a sentencing court will not have abused its discretion unless 'the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.'" *Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d 957, 961 (2007), quoting *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996).

"In determining whether a sentence is manifestly excessive, the appellate court must give great weight to the sentencing court's discretion, as he or she is in the best position to measure factors such as the nature of the crime, the defendant's character, and the defendant's display of remorse, defiance, or indifference. *Commonwealth v. Colon*, 102 A.3d 1033, 1043 (Pa. Super. 2014), quoting *Commonwealth v. Mouzon*, 828 A.2d 1126,

9

1128 (Pa. Super. 2003).

Defendant has not alleged that the judgment exercised by the court was manifestly unreasonable or the result of partiality, prejudice, bias or ill-will. Defendant has only alleged that the court did not accept his arguments as to why the sentence should be less than what was imposed.

The court considered all of the relevant factors as required and imposed a sentence that was consistent with the protection of the public, reflected the rehabilitative needs of Defendant, reflected the impact of the crime on the victim which was substantial and reflected the impact of the crime on the community.

Defendant's final argument is that the court relied upon impermissible factors in imposing the sentence. Specifically, Defendant contends that the court employed the deadly weapon used matrix as set forth in the guidelines and that said matrix is unconstitutional in light of the *Alleyne* decision. In the alternative, Defendant argues that the deadly weapon enhancements are vague and overbroad.

Defendant's arguments are specious at best. There is no basis whatsoever in law to support Defendant's arguments. The sentencing guidelines are advisory only and clearly outside the purview of *Alleyne*. ***Commonwealth v. Ali***, 112 A.3d 1210, 1226 (Pa. Super. 2015). As well, the vague and overbroad argument has been previously addressed by the Court and rejected. See ***Commonwealth v. McKeithan***, 350 Pa. Super. 160, 504 A.2d 294, 300-301 (1986).

While the trial court has no discretion as to whether it will apply § 303.4 and

10

add at least twelve (12) months and up to twenty-four (24) months to the standard sentencing guideline range when a defendant possesses a deadly weapon during the commission of an offense, it does have the discretion in imposing a sentence after it has determined the proper sentencing guideline range. *Commonwealth v. Bowen*, 417 Pa. Super. 340, 612 A.2d 512 (1992), quoting *Commonwealth v. Dotzman*, 558 A.2d 1312, 1317 (Pa. Super. 1991).

## ORDER

AND NOW, this ‑‑ day of August 2015, for the reasons set forth above, Defendant's post-sentence motion is denied.

By The Court,

Marc F. Lovecchio, Judge

cc:　Melissa Kalaus, Esquire (ADA)
　　　Robert Cronin, Esquire (APD)
　　　Gary Weber, Esquire (Lycoming Reporter)
　　　Work file

11

### IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH : 

vs. : No. CR-866-2011

SHAKOOR TRAPP, :
      Defendant :

### OPINION AND ORDER

Before the court is the Commonwealth's motion to preclude the defense from presenting expert testimony regarding eyewitness identification. The relevant facts follow.

On May 29, 2011, an individual entered a residence at 606 Maple Street in Williamsport Pennsylvania and assaulted a 23-year old African American female in an upstairs bedroom by stabbing, choking, and shooting her. Fortunately, she survived the attack and sought help at a neighbor's residence. After receiving medical treatment for her injuries, the victim identified the Defendant as her attacker through photographs shown to her by family members and a photo array conducted by the police. The police obtained a warrant for the Defendant's arrest as well as a warrant to search his residence. When the police executed the search warrant, they found a bloody sock near a couch in Defendant's living room.

Defendant was arrested and charged with attempted homicide, two counts of aggravated assault, burglary, criminal trespass, person not to possess a firearm, possessing instruments of crime, recklessly endangering another person and simple assault. Upon motion of the defense, the person not to possess charge was severed for trial purposes.

The parties stipulated that the severed firearm charge would proceed to a non-

1

 

jury trial and the other charges would proceed to a jury trial. The trial was held June 5-7, 2012. The jury trial ended in a mistrial, but the court convicted Defendant of the firearm charge. Defendant filed an appeal, claiming that re-trial of the remaining charges was barred by double jeopardy. This claim, however, was rejected by the appellate courts, and the case was placed back on the trial list.

Jury selection was scheduled for August 27, 2014. The day before jury selection defense counsel requested a continuance to seek leave to hire an expert witness regarding eyewitness identification. The court denied the continuance request and a jury was selected. The trial is scheduled for September 10-12, 2014.

On August 27, 2014, defense counsel contacted Dr. Jonathan Vallano about providing expert testimony on eyewitness identification in this case. On September 1, 2014, Dr. Vallano submitted a letter to defense counsel that described his prospective testimony regarding eyewitness memory issues. As September 1 was Labor Day and the courthouse was closed, defense counsel reviewed the letter and provided a copy to the prosecuting attorney via email on September 2, 2014. The Commonwealth immediately filed a motion to preclude the expert testimony, because its case is neither solely nor primarily dependent on eyewitness identification, a Frye hearing has not been held to determine the admissibility of the proposed expert testimony in this case, and the Commonwealth does not have sufficient time before trial commences to secure the services of its own expert.

The court held an argument on the motion on September 4, 2014. The argument focused on the reasons for defense counsel's delay in seeking and obtaining the

2

expert testimony and whether this case is one in which expert testimony regarding eyewitness identification is admissible.

Prior to May 28, 2014, expert testimony on the subject of eyewitness identification was per se inadmissible in Pennsylvania. On May 28, 2014, in the case of Commonwealth v. Walker, 92 A.3d 766 (Pa. 2014), however, the Pennsylvania Supreme Court held that the admission of expert testimony regarding eyewitness identification is no longer per se inadmissible; rather, the admissibility of such evidence is left to the discretion of the trial court. This does not mean that such testimony would be admissible in every case, though. The Court stated:

> Initially, we envision that allowing such expert testimony would be limited to certain cases. As discussed below, such testimony would only be permitted where relevant. Pa.R.E. 401. While we need not precisely define such situations, generally speaking, it would be where the Commonwealth's case is solely or primarily dependent upon eyewitness testimony.

92 A.3d at 787.

Defense counsel argued that expert testimony is admissible in this case because the case is based primarily on eyewitness testimony. He asserted that the bloody sock found in Defendant's residence is not enough to render the proposed expert testimony inadmissible because, but for the eyewitness identification of Defendant, Defendant's residence would not have been searched and the sock would never have been found. Furthermore, the sock is "in question" because Defendant's door had been kicked in sometime before the police arrived, which supports the defense argument that the real

3

perpetrator planted the sock in his residence.

The Commonwealth argued that <u>Walker</u> is distinguishable because the sole evidence was the eyewitness identification and the perpetrator was a stranger of a race different than the person who was assaulted. The Commonwealth also noted that its case is not based only on the eyewitness testimony of the victim. The Commonwealth pointed out that it also has two pieces of DNA evidence, the testimony of a neighbor that tended to corroborate the victim's identification, a videotaped statement in which the Defendant admits that the sock was probably his, and the fact that the police found the Defendant hiding in an attic for no good reason.

The court agrees with the Commonwealth that the facts of <u>Walker</u> are distinguishable. This case does not involve a complete stranger or a cross-racial identification. Although the victim did not know Defendant by name, she had seen him previously around the neighborhood. More importantly, this case is not solely or primarily dependent on eyewitness identification testimony.

At the previous trial, the victim testified that on May 29, 2011, she was awoken in the early morning hours believing that she was being "punched" in her chest. In fact, she was being stabbed by a person who she described during the trial as being African American, wearing a white or cream colored hoodie and who looked familiar. She testified that she had seen the individual previously around the neighborhood.

The perpetrator of the offense ended up not only stabbing Ms. Nixon but also choking her and eventually shooting her in her cheek, temple area and knee.

4

The victim testified that she had an ample opportunity to identify the individual who shot her and during the trial positively identified the Defendant as her assailant.

When the victim first spoke with the police immediately following her attack, she testified that she was not thinking clearly. She was confused, scared and in pain. Furthermore, she was worried about her physical condition and most of all about her children. As a result, she was unable to provide any specifics regarding her assailant to the police.

The victim was transported by ambulance to the Williamsport Emergency Room where she was assessed and then lifeflighted by helicopter to Geisinger Medical Center. She underwent emergency treatment, was admitted to the Intensive Care Unit and was intubated.

The victim started writing notes as her recollection of what occurred became clearer and as she testified her "memory got better." Among other things, she recalled that the attacker wore a white or cream colored hoodie and shot her with a small silver gun.

Her sister visited her in the hospital and based upon information her sister had received from others, showed Ms. Nixon three photographs obtained from Facebook of three different individuals. One of the photographs depicted Defendant. According to the victim, the photos jogged her memory and she recognized Defendant as her attacker.

Subsequently, the victim identified Defendant from a photo array that had been presented to her by the Williamsport Police. Without any suggestions being made to her,

5

she quickly picked out Defendant and identified him as her attacker. The photo array picture of Defendant was not the same Facebook photograph she had previously recognized.

According to the victim, there was no doubt in her mind that Defendant was the individual that attacked her. She had previously seen Defendant "quite often" outside of where she resided, among other things, smoking cigarettes. During her testimony, the victim positively identified Defendant as her attacker.

Officer Levan of the Williamsport Bureau of Police confirmed that when he first contacted the victim immediately following the attack, she was hysterical, crying obsessively, frantic, "absolutely" upset, unsteady and suffering from a "gross amount" of blood loss.

Agent Eric Delker of the Williamsport Bureau of Police confirmed the victim's testimony with respect to the photo array. He indicated that when he presented the array to her, there was nothing suggestive about it and he asked that she look at it closely to determine if there was anyone who she recognized. She identified Defendant and indicated that she was absolutely sure that he was the individual who attacked her and shot her.

A neighbor, Shana Saunders, testified that a few nights before the attack she had an encounter with Defendant. She heard Defendant fire a handgun and saw him with a small silver gun. Defendant asked Ms. Saunders not to tell anyone what she observed. Ms. Saunders also saw Defendant in front of his apartment, a few doors from the victim's apartment, only a few hours prior to the attack.

Agent Leonard Dincher of the Williamsport Bureau of Police indicated that

6

following the victim's identification of Defendant and further investigation, a warrant was issued for Defendant's arrest. He obtained information that Defendant was at 523 High Street. He and other police officers searched the residence and eventually found Defendant lying between ceiling joists in the rafters below the roof hiding from the police. Defendant was attempting to evade apprehension by hiding in an area of the home that was very inaccessible and in an area that was extremely hot with no ventilation whatsoever.

A search warrant was obtained for Defendant's residence and a pair of bloody socks was found in the living room. The blood stain was tested and a DNA expert testified that the DNA in the blood was consistent with that of the victim. The expert opined that the chances of the blood being similar to the DNA of another person were extremely small.

There were hairs and other material on the sock which initially were not submitted for DNA analysis. This evidence subsequently was submitted for DNA analysis and Defendant's DNA was discovered on the sock.

It is clear from the Pennsylvania Supreme Court opinion in Walker that the Court did not envision that expert testimony regarding eyewitness identification would be admissible in every case or even in thousands of cases. The court finds that the notes from the victim referencing a white or cream colored hoodie and a small silver gun, the supporting testimony from the neighbor, the bloody sock with both the victim's and Defendant's DNA on it, Defendant's videotaped statement that the sock was probably his and the evidence of Defendant's consciousness of guilt, are sufficient to show that the Commonwealth's case is

7

not primarily dependent upon eyewitness testimony. [1]  Therefore, the court will grant the Commonwealth's motion.

## **ORDER**

AND NOW, this ⁵ day of September 2014, the court GRANTS the Commonwealth's motion to preclude the defense from offering expert testimony regarding eyewitness identification in this case.

By The Court,

Marc F. Lovecchio, Judge

cc:  Melissa Kalaus, Esquire (ADA)
Robert Cronin, Esquire (APD)
Gary Weber, Esquire (Lycoming Reporter)
Work file

---

[1] The court was surprised and somewhat dismayed by counsel's statement that he was unaware of the Walker decision until sometime in July and the fact that he did not seek a continuance to consult with an expert until August 26, the eve of jury selection. The court, however, did not decide this issue based on counsel's delay, but solely on the fact that the Commonwealth's case is neither solely nor primarily based on eyewitness testimony.

8